T.C. Memo. 1996-76


UNITED STATES TAX COURT


ALICE BERGER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 2464-93, 3130-93,      Filed February 22, 1996.
          3133-93.


<u>Richard C. Antonelli</u>, for petitioner in docket No. 2464-93.


<u>John M. McNally</u>, for petitioners in docket Nos. 3130-93 and
3133-93.

<u>William F. Halley</u> and <u>Caroline Ades-Pierri</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined the following

---

[1]Cases of the following petitioners are consolidated
herewith:  Estate of Howard Berger, Deceased, Susan Berger,
Administratrix, docket No. 3130-93; and Estate of Howard Berger,
Deceased, Susan Berger, Administratrix, and Susan Berger, docket
No. 3133-93.

deficiencies in and additions to petitioners' Federal income tax:

Howard and Alice Berger (Docket Nos. 3130-93 and 2464-93):

|  |  | Addition to tax |
| Year | Deficiency | Sec. 6653(a)(1) |
| 1988 | $155,646 | $7,782 |

Alice Berger (Docket No. 2464-93):

|  |  | Addition to tax | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662 |
| 1989 | $307,202 | $76,801 | $61,440 |

Howard and Susan Berger (Docket No. 3133-93):

|  |  | Addition to tax |
| Year | Deficiency | Sec. 6651(a)(1) |
| 1989 | $68,801 | $23,577 |

The cases in the above-mentioned dockets have been consolidated for trial, briefing, and opinion. Following the trial, we granted respondent's motion for leave to file an amended answer asserting the following increased deficiency and addition to tax against Howard and Susan Berger (Docket No. 3133-93):

|  |  | Addition to tax |
| Year | Deficiency | Sec. 6651(a)(1) |
| 1989 | $237,936 | $57,404 |

Petitioners Howard and Susan Berger did not file a reply to respondent's amended answer. However, their opening brief contends that their 1989 return overstated taxable income from mausoleum crypt sales, none of which, they now assert, should have been reported by Howard Berger, and asserts an overpayment of $61,106.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties have settled some issues, and respondent has conceded the section 6653(a)(1) addition against Howard and Alice Berger for 1988 and the section 6651(a)(1) addition against Howard and Susan Berger for 1989. The following issues remain to be decided: (1) Evidentiary objections to certain exhibits and testimony; (2) whether Alice Berger signed the 1988 Form 1040 under duress so as to invalidate it as a joint return; (3) Howard Berger's and Alice Berger's respective ownership interests in the assets and business of Woodbine Cemetery (Woodbine) during 1988 and 1989 for purposes of determining their rights to income therefrom; (4)(a) whether petitioners' method of accounting for mausoleum crypt sales and costs should be upheld generally and (b) whether Howard Berger must accrue income or recognize gain on the transfer of his interest in Woodbine to Alice Berger pursuant to their divorce settlement agreement; (5)(a) whether Howard Berger or Alice Berger or both of them are required to recognize gain in 1989 from the sale of Woodbine to their daughter and son-in-law, (b) the adjusted basis of Woodbine at the time of sale, (c) whether a portion of the sale constituted a dealer disposition under section 453(b), which would prohibit use of the installment method for dealer assets, and (d) if so, whether and

how an allocation should be made between dealer and nondealer assets in order to determine whether and to what extent the gain on sale is entitled to installment treatment; (6) whether Howard Berger and Alice Berger are liable for additional self-employment tax for 1988 and 1989; and (7) whether Alice Berger is liable for the section 6651(a) addition to tax or section 6662 accuracy-related penalty for 1989.

After addressing the evidentiary questions, we hold that the 1988 return was a valid joint return and that petitioners used a proper method of accounting for mausoleum crypt sales. As a result, neither Howard Berger nor Alice Berger has taxable income from Phase II mausoleum crypt sales for 1988. We allocate cemetery income, including Phase II mausoleum crypt sales income, between Howard and Alice Berger for 1989. We hold that the gain on the sale of Woodbine is attributable in its entirety to Alice Berger. After discussing the rules for determining the bases of the Woodbine assets in the hands of Alice Berger, we use the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), to determine the portion of Alice Berger's Woodbine sale gain entitled to installment treatment as a nondealer disposition, leaving the details to a Rule 155 computation. We hold that Howard and Alice Berger are both subject to self-employment tax for 1988 and 1989, and that Alice Berger is not liable for the section 6651(a) addition to tax or the section 6662 accuracy-

related penalty for 1989.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and the accompanying exhibits are incorporated herein by this reference. When petitioners filed their respective petitions, Alice Berger resided in Vermont, and Howard Berger and Susan Berger resided in Florida.

Howard Berger and Alice Berger were married in 1953. During the marriage, Alice Berger was not employed outside the home. Prior to 1979, Howard Berger was an insurance salesman, and he continued to receive renewal commissions through 1989.

In 1979, Howard Berger purchased the Woodbine real property and cemetery business, located in Oceanport, New Jersey, from John and Lois Flock, for $100,000. The Flocks had operated Woodbine as a cemetery for in-ground interments.

Howard Berger continued the business of operating Woodbine as a cemetery for in-ground interments. From 1979 through 1989, the income of Woodbine from the sale of cemetery plots, interment fees, and headstones was reported on the cash basis method of accounting, as were most expenses. However, the cost of grave plots ($23 per plot) was carried in an inventory account and expensed for accounting and tax purposes when plots were sold.

By deed dated October 26, 1983, Howard Berger transferred

legal title in the Woodbine land, buildings, and structures into the joint names of Howard Berger and Alice Berger. Howard Berger put the Woodbine real property in their joint names because he believed that Alice Berger already had an interest in the property by reason of their marriage. By the end of 1983, Alice Berger knew that she was a joint owner of Woodbine. After Howard Berger transferred Woodbine into his and Alice Berger's joint names, he thought that they were its joint owners.

Subsequent to the 1983 transfer, Alice Berger's signature, or a copy thereof, appeared on deeds conveying cemetery spaces to customers of Woodbine.

From 1979 through 1986, Howard Berger managed and operated Woodbine and regularly went to work there. During this period, Alice Berger did not participate in the operation of Woodbine. In 1984, Howard Berger hired his son-in-law, Gregg Kunkowski, the husband of his and Alice's daughter Julia, as a salesman for Woodbine.

In 1984 Howard Berger began to construct a mausoleum on the Woodbine property (Phase I) and to solicit customers and receive deposits and installment payments for mausoleum crypts. The deposits and installment payments received prior to completion of Phase I were not recorded as income when received but were recorded as deposits pending completion of the Phase I mausoleum. The costs of construction of Phase I were not deducted as

incurred but were instead carried as inventory costs.

In 1986 construction of Phase I was completed.  Certificates of occupancy were obtained, and certificates of ownership were issued to all customers who had paid in full.  Howard and Alice Berger reported as income for 1986 all deposits and installment payments previously received for this phase.  The cost of construction of Phase I was allocated to the total number of crypts, and the allocated cost of unsold crypts was deducted ratably as "cost of sales" as Woodbine issued certificates of ownership to subsequent crypt purchasers at or after completion of construction of the mausoleum.

In June 1986, during a trip to Scotland, Howard Berger became ill with a heart condition, and he and Alice Berger separated.  When Howard Berger returned from Scotland, he did not move back to the family home in West Long Branch, New Jersey, but moved instead to Waterboro, Maine.  He never resumed day-to-day management or operation of Woodbine.

During Howard Berger's absence, Gregg Kunkowski acted as manager of Woodbine.  After it became clear that Howard Berger was not going to return to work, Gregg Kunkowski proposed a contract setting forth the terms for his continuing employment in the Woodbine business.  He presented his proposal to Dr. Florence F. Forgotson, Alice Berger's attorney, who drafted an agreement. On December 1, 1986, Howard Berger and Alice Berger (as

employers) and Gregg Kunkowski (as employee "General Manager") entered an employment agreement. The employment agreement provided for a 5-year term with an option to renew, compensation equal to 20 percent of "the total gross sales of space in the mausoleum", and rent-free occupancy by the Kunkowskis of "the home renovated by them on the premises, indefinitely".

Construction of the second Woodbine mausoleum (Phase II) began in 1987 and was completed in May 1989. In 1987, Gregg Kunkowski, as manager of Woodbine, began to solicit customers for crypts in the mausoleum to be constructed in Phase II. In 1987 Woodbine began to receive deposits and installment payments for crypts in Phase II.

A customer who paid a deposit on a crypt in Phase II would execute a contract setting forth the location of the crypt, the price, and the payment terms (the crypt purchase contracts generally provided that the customer would pay any unpaid portion of the purchase price in equal monthly installments--without stated interest--over a period of not more than 24 months). Prior to completion of construction, the purchaser would receive a Temporary Certificate of Ownership upon payment of the full contract price for a crypt in Phase II and then a Certificate of Ownership when the mausoleum was completed. After completion of construction, the purchaser would receive a Certificate of Ownership upon payment of the full contract price for space in

Phase II. The deposits and installment payments received by Woodbine in 1987 and 1988 for Phase II were not recorded as income when received; instead they were recorded as deposits pending completion of Phase II.

From October 1986 until March 14, 1989 (except for a short period during late 1987), Gregg Kunkowski wrote to each of Alice Berger and Howard Berger a $500 weekly check from Woodbine's bank account. These checks were posted to accounts on Woodbine's books entitled "AB Draw" or "Alice Berger Draw" and "HB Draw" or "Howard Berger Draw", respectively. Gregg Kunkowski also used the Woodbine business account to pay some of Howard and Alice Berger's personal expenses (e.g., telephone and utility bills). During 1988, Howard Berger and Alice Berger received $42,676 and $45,578, respectively, from the Woodbine business account.

In early 1987, Alice Berger initiated New Jersey divorce proceedings against Howard Berger. Alice Berger and Howard Berger were represented by counsel in these proceedings.    r about September 22, 1987,[2] Dr. Forgotson, as Alice Berger's attorney, sent Gregg Kunkowski a letter stating:

> Alice Berger has instructed me to advise you that as a joint owner of the Woodbine Cemetery & Mausoleum business, you are instructed not to make any payments on behalf of Howard Berger and/or Susan Moorehouse, for any reason, without the consent of Alice Berger * * *

---

[2]Although the letter is dated Sept. 22, 1988, subsequent court orders, dated Oct. 21, 1987, and Dec. 18, 1987, which restrain Alice Berger from interfering with Howard Berger's receipt of $500 per week from Woodbine, make clear that the letter should have been dated Sept. 22, 1987, and was sent about that time.

Dr. Forgotson sent copies of the letter to Alice Berger and Howard Berger's attorney. On October 21, 1987, the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County (the Chancery Court),

> ORDERED that plaintiff [Alice Berger] and/or her attorney [Dr. Forgotson] be and is hereby restrained from interfering with defendant's [Howard Berger's] receipt of income as a partner of the Woodbine Cemetery & Mausoleum in the amount of $500 per week * * * .

On December 18, 1987, the Chancery Court issued an order confirming that Howard Berger was entitled to draw $500 per week from the Woodbine business, retroactive to September 24, 1987.

During property settlement negotiations, Howard and Alice reached an impasse. Both of them wanted Woodbine, and neither was willing to let the other have it. To break the impasse, Howard and Alice Berger agreed that whoever was awarded Woodbine would sell it to Gregg and Julia Kunkowski for $680,000. On May 28, 1988, Howard and Alice Berger and Gregg and Julia Kunkowski executed an agreement (sale agreement), which stated:

> In the event that I, Alice Berger or I, Howard Berger, am awarded the property and business known as "Woodbine Cemetery" * * *; I will immediately sell Woodbine Cemetery to my daughter and son-in-law Julia B. and Gregg W. Kunkowski, who have been managing the business for the past two years.

In late 1988, Gregg Kunkowski began to solicit deposits and installment payments for crypts in a planned Phase IIIA mausoleum, construction of which did not commence until after November 17, 1989. Total deposits received on Phase IIIA crypts prior to November 17, 1989, totaled $49,616.

On November 25, 1988, American Cemetery Consultants submitted an appraisal of Woodbine to Gregg Kunkowski. According to this appraisal, which used both income valuation and net asset valuation methods, Woodbine at that time had a fair market value of $696,038. The gross and net assets of Woodbine were valued as follows:

| | |
|---|---|
| Cash (as of 10/1/88) | $20,000 |
| Accounts receivable ($428,601 @ 41.6%) | 172,298 |
| Office building | 100,000 |
| Residence | 75,000 |
| Service building | 80,000 |
| Storage building | 40,000 |
| Equipment and furnishings | 17,000 |
| Uninsured office and grounds equipment | 26,000 |
| Salable inventory: grave spaces | 12,518 |
| Salable inventory: mausoleum crypts | 42,992 |
| Salable inventory: cremation niches | 14,205 |
| Undeveloped land | 219,555 |
| Roads, landscaping, etc. | 43,200 |
| Gross Asset Valuation | [1] 878,681 |
| Less: Debt to McCleskey Mausoleum Co. 175,000 | |
| Net Asset Valuation | 703,681 |

[1] The correct sum of these figures is not $878,681 but $862,768, which brings the net asset valuation figure closer to the price of $680,000 ultimately agreed upon and paid.

American Cemetery Consultants viewed this result as supporting the valuation resulting from the income valuation method.

On or about March 14, 1989, Howard and Alice Berger entered into a settlement agreement, which resolved the issues of alimony, equitable distribution, counsel fees, and costs. Under the terms of the settlement agreement, the Berger family assets be divided as follows:

|                          | Alice Berger | Howard Berger |
|--------------------------|-------------:|--------------:|
| Vermont house            | $250,000     | ---           |
| New Jersey house[1]      | 333,000      | $666,000      |
| New Jersey furniture[2]  | 27,000       | 27,000        |
| Bonds                    | 40,000       | 120,000       |
| Note I                   | ---          | 50,300        |
| Note II                  | ---          | 292,205       |
| Keogh                    | ---          | 92,000        |
| Stock                    | ---          | 14,400        |
| Woodbine                 | 680,000      | ---           |
| Annuity                  | ---          | 13,000        |
|                          | 1,330,000    | 1,274,905     |

[1] The house was to be sold and the proceeds divided.

[2] Howard Berger was to use his share of the proceeds of sale of the house to purchase one-half the furniture from Alice Berger.

The Bergers' assets were divided approximately equally according to gross value. Although income tax liabilities were inherent in several of the assets (e.g., Woodbine, Keogh, and Note II (an installment sale note with a 78-percent gross profit percentage)), the settlement agreement did not expressly take account of or otherwise refer to tax liabilities. The settlement agreement provided that Howard Berger would indemnify Alice Berger for income taxes for years prior to 1986, but that they were equally liable for any income taxes due for 1986. The settlement agreement provided that the Bergers would file a joint income tax return for 1988 and share equally in any savings that resulted from filing a joint return.

The settlement agreement stated that "The property and business known as Woodbine Cemetery and Mausoleum including real, personal and business assets shall be transferred to * * * [Alice Berger]".

The settlement agreement also set forth the terms of the sale agreement requiring whoever was awarded Woodbine (Alice Berger) to sell it to Gregg and Julia Kunkowski for $680,000.

On March 14, 1989, Howard and Alice Berger and their counsel appeared in the Chancery Court and entered into the record the terms and conditions of the settlement agreement. Alice Berger testified that she understood the terms of the settlement agreement, that she had participated in its negotiation, that she agreed the settlement was fair and equitable, that no one had compelled her to accept its terms, and that she would abide by them if they were made a part of the Court's judgment.

Howard Berger's beneficial ownership interest in the Woodbine assets and business ceased on March 14, 1989. Thereafter, he no longer received weekly payments of $500 from the Woodbine business account, although several of his personal bills that had accrued prior to March 14, 1989, were paid thereafter. During 1989, Howard Berger received $10,034 from the Woodbine business account, $7,795 of which was paid prior to March 14, 1989.

From March 20 until November 13, 1989, Alice Berger received weekly payments of $1,000 (twice as much per week as she had been receiving prior to March 14, 1989) from the Woodbine business account. In addition, some of her personal expenses continued to be paid from the Woodbine business account. During 1989, Alice

Berger received, directly or indirectly, $61,404 from the Woodbine business account, $7,560 of which was paid prior to March 14, 1989.

On April 24, 1989, the Chancery Court entered a Judgement For Divorce. The judgment incorporated the settlement agreement and was stated to be effective as of March 14, 1989. The Chancery Court did not purport to pass on whether the settlement agreement was fair and reasonable, but stated that, based upon its observations and the parties' testimony, the settlement agreement had been voluntarily and knowingly entered into by the parties with able assistance of counsel. The Chancery Court determined that the settlement agreement became binding as a contract and as a judgment of the Court.

The requirement in the settlement agreement for a subsequent sale of Woodbine to Gregg and Julia Kunkowski was placed in the Judgement for Divorce at the insistence of Gregg Kunkowski. On May 8, 1989, Gregg Kunkowski wrote the following letter, on the Woodbine letterhead, to Alice Berger and Howard Berger, and to Julia's sister and brother, Florence and Richard Berger, who play no roles in this case:

May 8, 1989

Dear Alice, Florence, Howard, & Richard

I am writing this letter to appraise [sic] all of you of the situation which now exists here at the Cemetery and is of the utmost importance to all of us.

When building mausoleums in phases, as we are doing at Woodbine, it is common practice to segregate a certain

amount of crypts to be used for temporary entombment. These spaces are intended for those people who have purchased in future phases but had the misfortune of dying prior to the building's completion.

We have recently filled our last temporary entombment space in Phase I and now must seek a Certificate of Occupancy so that we may legally make entombments in Phase II. However, in obtaining a Certificate of Occupancy drastic tax ramifications will result for Howard and Alice in their 1989 tax situation. All monies collected for Phase II have been recorded as deposits so no tax has been paid on these monies. This is acceptable, legal accounting practice as we had not yet taken possession of the building. The moment we so take possession of the building, all the aforementioned monies become income to Howard and Alice and are then subject to income tax. Simply stated, Howard and Alice will have one wopping [sic] tax bill for 1989.

As we have no choice but to immediately obtain a C.O. and take possession of Phase II, there is but one alternative to circumvent this problem. Howard and Alice must immediately deed over the lands to the now existing Non-Profit Corporation, Woodbine Cemetery Association of Oceanport. Once it's done, the tax situation will no longer exist as the Association will not be subject to income tax.

The next step is to have the new corporation issue the necessary Certificates of Indebtedness. Howard has asked that these certificates be issued in both his and Alice's names. This is impossible as to do so would be a direct violation of a standing court order signed by Judge Kennedy on April 24, 1989, which reads as follows: "The Property and Business known as Woodbine Cemetery and Mausoleum including real personal and business assets shall be transferred to the wife, and the business known as Woodbine Cemetery and Mausoleum shall be thereafter sold to Julia Berger Kunkowski and her husband Gregg Kunkowski for the sum of $680,000. plus interest, all of which shall be paid over a period of twenty-five years at the rate of $72,717. per year and payable monthly at $6059.75 per month." The Certificates must be issued in Alice's name and the balance of the order executed.

This week I must obtain a Certificate of Occupancy so that entombment can be continued here at Woodbine. For

the good of all we have to go forward with the above as quickly as possible.

A cemetery is a public trust.  No one's personal problems should ever be permitted to supersede the needs of the members of the community whom we serve.

Very truly yours,


Gregg Kunkowski
Cemetery Manager

On June 10, 1989, Howard Berger and Susan Moorehouse were married, and she became known as Susan Berger.

By deed dated June 23, 1989, Howard Berger transferred his remaining legal title to the Woodbine real property to Alice Berger.  The delay in transfer of full legal title to Woodbine from Howard Berger to Alice Berger resulted from delay in securing an attorney to draft the necessary papers.

Howard and Alice Berger filed joint returns for 1979 through 1987, reporting the Woodbine income and expenses on Schedule C. They reported that Howard Berger was the proprietor of Woodbine and that all the income from Woodbine was self-employment income of Howard Berger.

On October 4, 1989, the Chancery Court ordered Alice Berger to show cause why an order should not be entered "Directing plaintiff [Alice Berger] to sign the 1988 Federal and state income tax returns and return them to defendant [Howard Berger] for filing".  The order was served on Alice Berger and her counsel.  On October 12, 1989, Alice Berger and her counsel

appeared before the Chancery Court.  They were not able to persuade the Chancery Court that Alice Berger should not have to sign the return as required by the terms of the settlement agreement.  Although Alice Berger believed that the 1988 return was erroneous, she also believed that the Chancery Court had ordered her to sign it, and she signed it at the courthouse. Howard Berger had previously signed the 1988 return on May 5, 1989.

On October 14, 1989, Alice Berger and Howard Berger timely filed their 1988 Form 1040.  Attached to the return was the statement:

> I, Alice W. Berger, do CERTIFY that I am signing this return under duress by court order.  It is my contention that there was a change in the accounting method of Woodbine Cemetery without approval of the Internal Revenue Service, and that this change does not clearly reflect income earned.
>
> I intend to seek relief under Furnish v. Comm., 59-1 USTC, para 9189 and Brown v. Comm., 51TC116.

None of the Federal income tax returns filed by Howard or Alice Berger for the taxable years 1986 through 1989 reported any gross income in respect of payments to them or on their behalves from the Woodbine business account.

By deed dated November 17, 1989, Alice Berger transferred ownership of the Woodbine real property to Woodbine Cemetery Association of Oceanport, Inc. (Woodbine Association), in exchange for Woodbine Association Certificates of Debt having a

face value of $680,000 and bearing interest at 9-3/4 percent.[3]
On the same day, Alice Berger transferred her interest in the
Woodbine Association Certificates of Debt to Gregg and Julia
Kunkowski in exchange for a $680,000 note signed by Gregg and
Julia Kunkowski as makers to Alice Berger as payee.  The note
called for monthly payments of principal and interest of
$6,059.75 for a term of 25 years.  During 1989, Alice Berger
received two payments, totaling $12,119.50, on the note.

The parties have stipulated that the 1989 income statement
of Woodbine accurately reflects its income, expenses, and net
income for the period January 1 through November 17, 1989
(including therein $491,432 of deposits with respect to Phases I,
II, and IIIA, and $217,124 allocated as cost of goods sold for
Phases II and IIIA), if all such deposits are found to be
properly includable in income for 1989.  The Woodbine 1989 income
statement shows net income of $383,133, which the parties have
stipulated is the taxable income of Woodbine for the period
January 1-November 17, 1989, if such deposits are found to be
properly includable in income for 1989.

Fully reported on the Howard and Alice Berger 1988 joint

---

[3]Although the Certificates of Debt are not in evidence,
Special Resolution #2 attached to the minutes of the Nov. 17,
1989, meeting of the Board of Trustees of Woodbine Association
recites that the face amount of the Certificates of Debt was
$680,000, plus interest at 9-3/4 percent, "with interest payments
only made on a monthly basis in the amount of $5,525 per month.
The principal shall be due within 180 days of demand made by the
Holder of the Certificates".

return Schedule C were the following amounts received in 1988:
The total cemetery sales income (plot sales, openings and markers) received in 1988; the total interest from the maintenance and preservation account; and the total deposits and installment payments received on the Phase I mausoleum.

The total deposits and installment payments received on sales of crypts in the Phase II and Phase IIIA mausoleums in 1987 and 1988 were as follows:

|            | 1987      | 1988      | Total     |
|------------|-----------|-----------|-----------|
| Phase II   | $131,922  | $352,193  | $484,115  |
| Phase IIIA | -0-       | 7,317     | 7,317     |
|            | 131,922   | 359,510   | 491,432   |

These amounts were not reported on the 1987 and 1988 joint returns of Howard and Alice Berger.

The total deposits and installment payments received on sales of Phase I, II, and IIIA mausoleum crypts for the periods January 1 to March 14, 1989, and March 15 to November 17, 1989, were as follows:

|            | Jan. 1-Mar. 14, 1989 | Mar. 15-Nov. 17, 1989 |
|------------|----------------------|-----------------------|
| Phase I    | $49,733.81           | $106,989.26           |
| Phase II   | 48,074.82            | 149,681.00            |
| Phase IIIA | -0-                  | 42,299.48             |
| Adjustment | 2,378.35             | -0-                   |
| Refunds    | ( 1,107.60)          | ( 3,158.00)           |
|            | 99,079.38            | 295,811.74            |

The total cemetery income (plot sales, openings, and markers) for the above periods in 1989 was as follows:

|  | Jan. 1-Mar. 14, 1989 | Mar. 15-Nov. 17, 1989 |
|--|----------------------|-----------------------|

Cemetery Income          $36,030.36                    $126,710.40

The total interest income (interest on maintenance and preservation funds) for the above periods in 1989 was as follows:

|                  | Jan. 1-Mar. 14, 1989 | Mar. 15-Nov. 17, 1989 |
|------------------|----------------------|-----------------------|
| Interest Income  | $7,262.19            | $22,779.55            |

The total cost of the Phase II mausoleum was $313,869, which, when divided by the number of crypt spaces--324--yields a per-unit cost of $968.73.

The allocated cost of goods with regard to 1987 and 1988 sales of crypts in the Phase II mausoleum and Phase IIIA mausoleum (full payment made) was $217,124.12, computed as follows:

```
224 Phase II units at $968.73      $216,995.52
  4 Phase IIIA units at $32.15          128.60
          Total                     217,124.12
```

The above amounts were based upon total construction costs incurred as of November 17, 1989.

The remaining cost of the assets shown on the books of Woodbine--cash, grave and mausoleum inventories, building improvements and equipment, less depreciation (Howard Berger's original cost was $100,000)--as of November 17, 1989, was $75,945.  This included $5,000 of purchased goodwill, which had not been assigned any value in the American Cemetery Consultants appraisal.  In addition, the face amount of the receivables of Woodbine on that date was $429,371.

Alice Berger's accountant signed, and timely filed on behalf

of Alice Berger, an application for an automatic extension of
time, until August 15, 1990, to file her 1989 income tax return,
and for an additional extension until October 15, 1990.  The
explanation of why the additional extension was needed states:
"1988 return is under audit and changes may affect 1989".  The
District Director approved the application for additional
extension about August 20, 1990.  Alice Berger made no estimated
tax payments with her applications for extensions to file her
1989 return.  Alice Berger mailed her 1989 income tax return
(Form 1040) on October 12, 1990, and it was received by the
Service Center on October 17, 1990.

Schedule C attached to Alice Berger's 1989 income tax return
reported a net loss from Woodbine of $4,101, having included
slightly less than one-half of Woodbine's gross income and almost
all of its expenses for 1989.  Attached to the return was the
following statement:

> Schedule C was originally prepared by Daniel Hochberg,
> accountant for Woodbine Cemetery.  In 1989 the 1988
> Federal income tax return of Howard and Alice Berger
> was audited and accordingly, an adjustment to income
> was made for an additional $229,396.  This item
> represented deferred income that was being book [sic]
> for future years.  Therefore upon receipt of the RAR,
> this adjustment was made on the 1989 Federal tax
> return.

Alice Berger reported the 1989 sale of Woodbine, using Form
6252 for the installment method, on her 1989 income tax return.
She reported the sale price of $680,000 but claimed that the
adjusted basis was $680,000, resulting in no reported gain or

loss.

On September 13, 1990, approximately 1 month prior to the filing of Alice Berger's 1989 income tax return, the Internal Revenue Service had issued a report, Form 4549, in connection with the examination of the 1988 income tax return of Howard and Alice Berger. The report took the position that Phase II mausoleum crypt sales payments were taxable Schedule C income in the amount of $229,396 to Howard and Alice Berger. The statutory notice issued by respondent to Howard and Alice Berger for 1988 determined that their Schedule C gross income in respect of Woodbine should be increased by $491,432 in respect of Phases II and IIIA mausoleum crypt sales payments, without any offset for the costs allocable thereto.

On March 18, 1991, the Internal Revenue Service issued a report, Form 4549, in connection with the examination of the 1989 income tax return of Alice Berger. The report took the position that Alice Berger's Schedule C taxable income from Woodbine during the year amounted to $208,889. The report also took the position that Alice Berger realized and recognized taxable income of $604,055 on the sale of Woodbine, allowing a cost basis equal to $75,945. The statutory notice issued by respondent to Alice Berger for 1989 determined that her gross income from Woodbine should be increased by $475,112 in respect of mausoleum crypt sales payments, without any offset for the costs allocable thereto, and also determined that she realized and recognized

taxable ordinary income of $604,055 on the sale of Woodbine.

Howard and Susan Berger filed a timely application for an automatic extension of time until August 15, 1990, to file their 1989 Form 1040. They included a $10,000 estimated tax payment with the application. Howard and Susan Berger filed their 1989 Form 1040 on July 26, 1990.

On Schedule C attached to Howard and Susan Berger's 1989 return, they reported $175,142 of taxable income from the Woodbine business, based upon a computation of one-half of the income from before March 14, 1989, for Phase II mausoleum crypt sales and less than 10 percent of the total Woodbine operating expenses for 1989.

On July 1, 1991, the Internal Revenue Service issued an amended report, Form 4549, in connection with the examination of the 1989 income tax return of Howard and Susan Berger. The report and respondent's statutory notice took the position that Howard Berger's Schedule C taxable income from Woodbine during 1989 should be increased by $245,716, without any offset for the costs allocable thereto. Respondent's amended answer takes the position that Howard Berger also realized and recognized taxable income of $604,055 on the sale of Woodbine to the Kunkowskis.

Howard Berger died on April 20, 1994.

OPINION

As in many cases in which we sort out the tax consequences to former spouses of the property settlement attending the dissolution of their marriage, respondent is largely a stakeholder. But although the cases have been consolidated, and properly so, the benefits of consolidation could prove to be transitory and ephemeral. Barring stipulations to the contrary, the consolidated cases will be appealable in different circuits because the former spouses had changed residence by the times they filed their petitions. Even though New Jersey equitable distribution orders can only be modified under exceptional and compelling circumstances, Torwich v. Torwich, 660 A.2d 1214, 1216 (N.J. Super. Ct. App. Div. 1995), there could be further litigation to decide how the tax liabilities we determine in these cases will be finally allocated between Alice Berger and the Estate of Howard Berger. Cf. In re Hargrave, 43 Cal. Rptr. 2d 474 (Ct. App. 1995); Hill v. Richards, 667 A.2d 695 (N.J. 1995). Although "[W]e are not called upon to determine the ultimate responsibility for such tax" as between Alice Berger and the Estate of Howard Berger, Yonadi v. Commissioner, T.C. Memo. 1992-602, revd. and remanded on other grounds 21 F.3d 1292 (3d Cir. 1994), the past, current, and possible future expenditures of judicial and party resources would have been substantially reduced if the parties had followed our suggestions that they

enter a comprehensive settlement of the cases that we are now required to decide.

By 1988 amendment to the New Jersey equitable distribution law, the tax consequences to each spouse of a proposed distribution are included in the factors to be considered by the New Jersey court.  N.J. Stat. Ann. sec. 2A:34-23.1(j) (West 1987 & Supp. 1995).  New Jersey courts recognized--even before this amendment--that tax consequences, including Federal tax consequences, should be taken into account in making an equitable distribution.  Dugan v. Dugan, 457 A.2d 1, 10 (N.J. 1983); Stern v. Stern, 331 A.2d 257, 261 (N.J. 1975); Painter v. Painter, 320 A.2d 484, 493 (N.J. 1974).  Compare Goldman v. Goldman, 646 A.2d 504, 508-509 (N.J. Super. Ct. App. Div. 1994) with Orgler v. Orgler, 568 A.2d 67, 74 (N.J. Super. Ct. App. Div. 1989).

The fact that a New Jersey court ordering an equitable distribution would have considered Federal tax consequences was an important factor in the decision of the Court of Appeals for the Third Circuit in Yonadi v. Commissioner, 21 F.3d at 1296, that the wife was liable for the capital gains tax attributable to the sale proceeds from the portion of the appreciated assets of a business allocated to her under a New Jersey divorce settlement agreement.[4]  The Court of Appeals held that imposition

---

[4]Alice Berger asks us to disregard Yonadi v. Commissioner, 21 F.3d 1292 (3d Cir. 1994), revg. and remanding on other grounds T.C. Memo. 1992-602, because no appeal in the case at hand would
(continued...)

of the capital gains tax entirely on the husband would materially distort the one-third/two-thirds distribution that the New Jersey court intended.

Under New Jersey law, equitable distribution is not to be skewed along fault lines.  N.J. Stat. Ann. sec. 2A:34-23.1 (West 1987 & Supp. 1995); Chalmers v. Chalmers, 320 A.2d 478, 482 (N.J. 1974); Tweedley v. Tweedley, 649 A.2d 630, 633 (N.J. Super. Ct. Ch. Div. 1994); Kothari v. Kothari, 605 A.2d 750, 755 (N.J. Super. Ct. App. Div. 1992).  Assuming as we do that Howard and Alice Berger originally intended an approximately equal distribution, we have no reason to believe that they also intended, as Alice Berger now would have it, that Howard Berger was to bear the entire burden of the Federal income tax known to inhere in the deposits and unrealized receivables attributable to crypt sales of the Phase II mausoleum completed in 1989, as well as the gain on the sale of Woodbine to the Kunkowskis.

Looking at the asset allocation under the settlement agreement, see supra p. 12, it's obvious that there would be a substantial imbalance in favor of Alice--to the detriment of Howard's estate--if he were subjected to all Federal income tax

_____

[4](...continued)
lie to the Court of Appeals for the Third Circuit.  We cite and apply the approach of the Court of Appeals in Yonadi because that court has special familiarity with New Jersey law, which governs the marital property rights of Howard and Alice Berger, and because we find persuasive its approach to arriving at an understanding of the interaction of the New Jersey equitable distribution law and the Federal tax law.

inherent in the cemetery assets and business transferred to the Kunkowskis. Not only was Howard Berger to receive property having a gross value $55,000 less than what was to be received by Alice Berger; if he were to be saddled with all the tax liabilities inherent in Woodbine, while Alice Berger were to receive Woodbine free and clear of such liabilities, the after-tax advantage to Alice Berger would be even more lopsided. Cf. Arnes v. Commissioner, 102 T.C. 522, 540-541 (1994) (Beghe, J., concurring). This is a state of affairs that we believe a New Jersey court would have wished to avoid, see Goldman v. Goldman, 646 A.2d at 509, and we will try to avoid it in our effort to reach an appropriate result.

We conclude, for reasons more fully explained infra, that Howard Berger should not be subjected to any greater income tax liability for 1989 than he originally reported on his 1989 return. We are impressed by the likelihood that Howard's 1989 return position reflected a contemporaneous understanding of how the parties would treat the property settlement transaction for tax purposes. In contrast, Alice's 1989 return positions--which showed a loss on her share of the Woodbine operation for 1989--and her litigating positions in this case strike us as somewhat aggressive: Alice argues that the receipts from the Phase II mausoleum crypt sales are taxable to Howard in their entirety for 1988 or 1989, and that he is also taxable on the entire gain on the sale of Woodbine to the Kunkowskis.

Issue 1.  Evidentiary Problems

The Federal Rules of Evidence generally apply to proceedings before this Court.  Sec. 7453; Estate of Shafer v. Commissioner, 80 T.C. 1145, 1151 (1983), affd. 749 F.2d 1216 (6th Cir. 1984).

Issue 1(a).  Exhibit 36-AJ, Letter From Gregg Kunkowski

Respondent's opening brief "objects to the admission of this [May 8, 1989] letter to prove the truth of the assertions within such letter, on hearsay grounds".  Respondent goes on to state that "The letter is admitted for the limited purpose of showing what was communicated to Howard and Alice Berger on or about such date."  Neither Howard Berger nor Alice Berger has asserted that the letter qualifies for an exception to the hearsay rule, nor has either proposed facts based on the letter.  The letter is admitted for the purpose specified by respondent and for whatever bearing the fact that it was communicated to Howard and Alice Berger might have on their states of mind in consummating the 1989 transaction in which Woodbine was transferred to the Kunkowskis.  It also tends to indicate that Gregg Kunkowski played a dominant role in planning the Woodbine transactions in 1989.

Issue 1(b).  Exhibits 46-AT, 57, and 58, Documents Signed by Alice Berger

Alice Berger asserts that these exhibits are hearsay and objects to their use to prove that she was an owner of the Woodbine business.  Respondent asserts that they are party

admissions.  See Fed. R. Evid. 801(d)(2).  We agree with respondent.

Rule 801(d) of the Federal Rules of Evidence provides that "A statement is not hearsay if--* * * (2) Admission by party-opponent.--The statement is offered against a party and is * * * (B) a statement of which * * * [he] has manifested * * * [his] adoption or belief in its truth".

Alice Berger signed Exhibit 46-AT, the 1-1/2 page employment agreement, which was

> made this 1st day of December, 1986, between ALICE BERGER and HOWARD BERGER, husband and wife, and owners of the Woodbine Cemetery and Mausoleum, * * * hereinafter referred to as the "employers", and GREGG KUNKOWSKI, * * * hereinafter referred to as the "employee".

Alice Berger's attorney, Dr. Forgotson, drafted, and Alice Berger signed, Exhibit 57, an answer to Howard Berger's motions for restraint, which was filed with the Superior Court of New Jersey in the Bergers' divorce action.  In five different places, the answer describes the Woodbine business as "jointly" owned.

On or about September 22, 1987, Dr. Forgotson drafted and signed, and Alice Berger signed, Exhibit 58, a letter sent to Gregg Kunkowski at the Woodbine business office.  The letter is from Dr. Forgotson and states:

> Alice Berger has instructed me to advise you that as a joint owner of the Woodbine Cemetery & Mausoleum business, you are instructed not to make any payments on behalf of Howard Berger and/or Susan Moorehouse, for any reason, without the consent of Alice Berger. * * *

We find that Alice Berger read and adopted the statements contained in Exhibits 46-AT, 57, and 58.  Therefore, they are party admissions and not hearsay.  Fed. R. Evid. 801(d)(2)(B).

Issue 1(c).  Exhibit 59, Letter From Alice Berger's Divorce Counsel to Judge Fundler

Alice Berger asserts that a letter dated April 13, 1987, from Dr. Forgotson to Judge Fundler is hearsay and objects to its use to prove that she was an owner of the Woodbine business. Respondent asserts that it is a party admission.  See Fed. R. Evid. 801(d)(2).  We agree with respondent.

Rule 801(d) of the Federal Rules of Evidence provides that

A statement is not hearsay if--* * * (2) Admission by party-opponent.--The statement is offered against a party and is * * * (C) a statement by a person authorized by * * * [him] to make a statement concerning the subject * * * .

On March 13, 1987, in the case of Berger v. Berger, No. FM-09545-87 (N.J. Super.), Judge Fundler ordered Howard Berger to make certain payments to Alice Berger.  On April 13, 1987, Dr. Forgotson, acting as Alice Berger's counsel in the divorce proceeding, sent Judge Fundler the April 13 letter to clarify his March 13 order.  In the April 13 letter, Dr. Forgotson stated that "Mrs. Berger owns one half interest in the Woodbine Cemetary [sic] business.  Any sums payable by the cemetary [sic] are therefore coming out of her share of the business as well."

We find that Dr. Forgotson's statements in the letter to Judge Fundler were authorized by Alice Berger; therefore they are

party admissions, not hearsay.  Fed. R. Evid. 801(d)(2)(C).

Issue 1(d).  Testimony of Gregg Kunkowski

At trial, Gregg Kunkowski's testimony about Alice Berger's statements of ownership was admitted for the purpose of proving that Alice Berger held herself out as a joint owner.  Alice Berger asserts that the testimony is hearsay and objects to its use to prove that she was an owner of the Woodbine business.  Respondent asserts that it is a party admission.  See Fed. R. Evid. 801(d)(2).

We find that Alice Berger's statements to Gregg Kunkowski are party admissions, not hearsay.  Fed. R. Evid. 801(d)(2)(A).

Although Alice Berger's admissions of joint ownership in the Woodbine business do not conclusively establish her ownership, they are strong evidence that she held herself out as an owner and that she accepted the benefits and burdens of ownership.

Issue 2. Duress

The settlement agreement of March 14, 1989, between Howard and Alice Berger provided that they would file a joint income tax return for 1988 and share equally in any resulting tax savings.

When Alice Berger appeared in the Chancery Court with counsel on March 14, 1989, she testified that she understood the terms of the settlement agreement, that she had participated in its negotiation, that the settlement agreement was fair and equitable, that no one had compelled her to accept its terms, and that she would abide by them if they were made a part of the

court's judgment. The Chancery Court's Judgment for Divorce, entered April 24, 1989, recited that, based upon the court's observations and the parties' testimony, the settlement agreement had been voluntarily and knowingly entered into by the parties with able assistance of counsel. The judgment also stated that the settlement agreement had become binding as a contract and as the court's judgment.

Although Alice Berger received various benefits under the settlement agreement, she did not sign the joint 1988 Federal income tax return prepared for Howard Berger until, subsequent to his application, the Chancery Court ordered her, on October 4, 1989, to show cause why an order should not be entered directing her to sign it. On October 12, 1989, she appeared with her counsel before the Chancery Court and tried but was not able to persuade the Chancery Court that she should not have to sign the return. Then, in the belief that the Chancery Court had ordered her to sign the return, she signed it at the courthouse. However, she attached to the return a statement that she was signing a return that she believed to be incorrect and that she intended to seek relief under Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part on this issue Funk v. Commissioner, 29 T.C. 279 (1957), and under Brown v. Commissioner, 51 T.C. 116 (1968). She now argues that the return is not a valid joint return because she signed it under duress.

When spouses file a joint return, the tax is computed on their aggregate income, and their liability for the tax is joint and several. Sec. 6013(d)(3). A taxpayer's liability on a joint return depends on the taxpayer's voluntary execution of the return. Stanley v. Commissioner, 45 T.C. 555, 560 (1966). A taxpayer who signs a return under duress has not voluntarily executed the return and will not be held liable for the tax shown due thereon, or for any tax deficiency for the year in question that is attributable to the other spouse. Stanley v. Commissioner, 81 T.C. 634, 637-638 (1983).

We have stated that duress is determined "under a uniform standard unaffected by the idiosyncracies of particular State law" and implied that we would develop an independent Federal standard. Brown v. Commissioner, 51 T.C. at 119-120. However, the cases that we cited support this conclusion only to a limited extent,[5] and recent opinions of the Supreme Court seem to indicate that we should

---

[5]We said that the Court of Appeals in Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part on this issue Funk v. Commissioner, 29 T.C. 279 (1957), "[formulated] a standard of duress applicable in Federal tax controversies", but it would appear that court was rather clearly applying the California law of duress. The other case cited in Brown v. Commissioner, 51 T.C. 116 (1968), in support of our statement was Stanley v. Commissioner, 45 T.C. 555 (1966); while that case did support a nationwide uniform standard of duress for the purpose of determining the validity of a Federal income tax return as a joint return, id. at 561-562, it expressly denied that it was establishing a Federal common law of duress, id. at 562 n.12.

apply State law on this issue.[6]

One reason to apply State law is that, in the area of duress, as in other areas, a distinct Federal common law has not developed.[7]   However, if we were to develop it, we would presumably follow the Restatement, Contracts 2d (1981).  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1481 (6th Cir. 1989) (using Restatement, Contracts 2d to determine minimum requirements under Federal common law of contracts with respect to duress and abuse-of-fiduciary-relationship issues).  Under the Restatement, an improper threat by a party to a contract makes that contract voidable by the other party for reasons of duress when that threat leaves the victim no reasonable alternative to

---

[6]Although Federal contracts are a paradigm area for the application of Federal common law, Boyle v. United Technologies Corp., 487 U.S. 500, 504  (1988), the Supreme Court expressly refused to commit itself on whether State or Federal law governed on the issue of duress in connection with a Federal military contract in United States v. Bethlehem Steel Corp., 315 U.S. 289, 299-300 (1942).  The Supreme Court's latest extended pronouncement on the issue of Federal common law, O'Melveny & Myers v. FDIC, ___ U.S. ___, 114 S. Ct. 2048 (1994), a unanimous decision, would seem to indicate that State law should be applied to decide the duress issue before us.

[7]"A federal common law of landlord and tenant does not exist."  Powers v. U.S. Postal Service, 671 F.2d 1041, 1045 (7th Cir. 1982) (Posner, J., deciding to use State law to decide landlord-tenant dispute to which Postal Service was a party). "For a variety of reasons having mainly to do with the paucity of federal common law rules and the desirability of keeping the law as simple as possible, federal courts asked to make federal common law do so usually by adopting state law."  Harrell v. United States, 13 F.3d 232, 235 (7th Cir. 1993) (Posner, J., using State law to decide quiet title actions against Internal Revenue Service); see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1481 (6th Cir. 1989) (Federal common law of release "largely undeveloped" in cases).

manifesting assent to the contract.  1 Restatement, Contracts 2d, sec. 175(1) (1981).  However, an improper threat by a third party not a party to the transaction will render the contract voidable only if the uninvolved party to the contract has not in good faith and without reason to know of the duress either given value or relied materially on the transaction.  Id. sec. 175(2).  For our purposes, a threat inducing assent to a contract is improper either (1) if what is threatened is the use of civil process and the threat is made in bad faith or (2) if the resulting exchange is not on fair terms and what is threatened is otherwise a use of power for illegitimate ends.  Id. sec. 176.

If State law governs, either independently or because Federal common law so dictates,[8] we must decide which State law, and that is a choice-of-law question.  In this case, we have jurisdiction under the Internal Revenue Code.  Therefore Federal common law applies to the choice-of-law rule determination, and this means applying the approach of the Restatement, Conflict of Laws 2d (1971).  Morewitz v. West of England Ship Owners Mut. Protection & Indem. Association (Luxembourg), 62 F.3d 1356, 1362 n.13 (11th Cir. 1995); Congress Talcott Corp. v. Gruber, 993 F.2d

---

[8]Even if Federal common law does govern our issue, it would appear that the Federal common law would merely apply the relevant State law.  O'Melveny & Myers v. FDIC, ___ U.S. at ___, 114 S. Ct. at 2053; cf. United States v. Kimbell Foods, 440 U.S. 715, 727-729 (1979); United States v. Brosnan, 363 U.S. 237, 241-242 (1960) (adopting State law as rule of decision in Federal tax case despite desirability of uniformity); North Am. Rayon Corp. v. Commissioner, 12 F.3d 583, 589-590 (6th Cir. 1993), affg. T.C. Memo. 1992-610 (applying New York law of undue influence).

315, 319 (3d Cir. 1993) (Federal tax issue); <u>Schoenberg v. Exportadora de Sal</u>, 930 F.2d 777, 782 (9th Cir. 1991); <u>Albany Ins. Co. v. Kieu</u>, 927 F.2d 882, 891 (5th Cir. 1991); <u>Edelmann v. Chase Manhattan Bank</u>, 861 F.2d 1291, 1294 (1st Cir. 1988); <u>Harris v. Polskie Linie Lotnicze</u>, 820 F.2d 1000, 1003 (9th Cir. 1987); <u>Pittston Co. v. Allianz Ins. Co.</u>, 795 F. Supp. 689-690 (D.N.J. 1992).[9]  Whatever choice of law rule we were to use, however, whether it be the most-significant-relationship test of 1 Restatement, Conflict of Laws 2d, section 6 (1971) or some other test, New Jersey law would apply.[10]

---

[9]Restatements are used as sources for determining Federal common law rules in other areas besides conflict of laws.  <u>Town of Newton v. Rumery</u>, 480 U.S. 386, 391-392 (1987) (contracts, enforceability of release); <u>Central States, Southeast & Southwest Areas Health & Welfare Fund v. Pathology Labs., P.A.</u>, 71 F.3d 1251, 1254 (7th Cir. 1995) (restitution, trusts in ERISA case); <u>Burlington Northern R. Co. v. Hyundai Merchant Marine Co.</u>, 63 F.3d 1227, 1231 (3d Cir. 1995) (judgments, issue preclusion); <u>Moench v. Robertson</u>, 62 F.3d 553, 566 (3d Cir. 1995) (trusts, ERISA); <u>United States v. Northrop Corp.</u>, 59 F.3d 953, 958-963 (9th Cir. 1995) (contracts, enforceability of release); <u>Luden's Inc. v. Local 6 Bakery, Confectionery & Tobacco Workers' Intl. Union of Am.</u>, 28 F.3d 347, 354-355 (3d Cir. 1994) (contracts, collective bargaining agreement in labor law); <u>Livingstone v. North Belle Vernon Borough</u>, 12 F.3d 1205, 1210 n.6 (3d. Cir. 1993) (contracts, enforceability of release).

[10]The result would be the same--and New Jersey law would apply--under New Jersey's choice-of-law principles.  On contractual issues, New Jersey uses the law of the place where the contract was concluded, lex loci contractus, unless the most-significant-relationship test of 1 Restatement, Conflict of Laws 2d, sec. 6 (1971) compels a different result.  <u>NL Indus., Inc. v. Commercial Union Ins. Co.</u>, 65 F.3d 314, 319 (3d Cir. 1995); <u>Gilbert Spruance Co. v. Pennsylvania Manufacturers' Association Ins. Co.</u>, 629 A.2d 885, 888 (N.J. 1993); <u>Harleysville Ins. Co. v. Crum & Forster Personal Ins.</u>, 588 A.2d 385, 387-388 (N.J. Super. Ct. App. Div. 1990); cf. <u>D'Agostino v. Johnson & Johnson, Inc.</u>, 628 A.2d 305, 320-321 (N.J. 1993).

In recent years, New Jersey has noticeably liberalized its law of psychological or moral duress. Warner-Lambert Pharmaceutical Co. v. Sylk, 471 F.2d 1137, 1143-1144 (3d Cir. 1972) (citing Rubenstein v. Rubenstein, 120 A.2d 11, 14 (N.J. 1956)). However, even though New Jersey no longer requires that duress produce fear sufficient to overcome the will of a person of ordinary firmness, but only that the fear overcome the will of the person threatened, it still requires that the threat be wrongful. Warner-Lambert Pharmaceutical Co. v. Sylk, 471 F.2d at 1144 (citing Rubenstein v. Rubenstein, 120 A.2d at 14); Continental Bank v. Barclay Riding Academy, Inc., 459 A.2d 1163, 1175 (N.J. 1983); New Jersey Hosp. Association v. Fishman, 661 A.2d 842, 848 (N.J. Super. Ct. App. Div. 1995).

Alice Berger asserts that the Chancery Court ordered her to sign the 1988 return and that she signed it because she believed she had no choice and was afraid of the "consequences" of defying a court order. Although she signed the return at the courthouse, she does not appear to have been signed it before a judge who was threatening improper or oppressive "consequences". See In re N.D.N.Y. Grand Jury Subpoena No. 86-0351-S, 811 F.2d 114 (2d Cir. 1987; In re Marriage of Betts, 558 N.E. 2d 404, 427, 430 (Ill. App. Ct. 1990). Alice Berger did not testify that the Chancery Court had threatened "consequences" directly to her. Nor did she testify to the consequences she believed she had been threatened with.

Alice Berger and her attorney had an opportunity to show the Chancery Court why Alice should not be ordered to sign the joint return; she was ordered to show cause. Although Alice Berger testified that her attorney told her--and that she believed--the Chancery Court had ordered her to sign the return, the Chancery Court's order was not entered into evidence, and no one else who testified had personal knowledge of whether she was ordered to sign the return.

As a result, we're not sure whether Alice Berger signed the return under a court order or on her attorney's advice. If she signed the return on her attorney's advice, we would be reluctant to intrude into the attorney-client relationship. If the Chancery Court ordered her to sign the return, that would appear to have happened because she failed to show cause why she should not be ordered to sign it. Without a showing of abuse of discretion or threat of improper sanction, we would be reluctant to impugn the Chancery Court's authority by construing its exercise to have been improper or wrongful. See Groom v. Mortimer Land Co., 192 F. 849, 852-853 (5th Cir. 1912) (execution of deed under "coercion of the court's decree" is voluntary). Even if such an order by the Chancery Court might have been erroneous, Peskin v. Peskin, 638 A.2d 849 (N.J. Super. Ct. App. Div. 1994) (error for Chancery Court to coerce settlement agreement in divorce case), we cannot say that it rose to the level of being improper or wrongful, especially since Alice had

already freely agreed to the settlement agreement and derived benefits from it.  See Smith v. Commissioner, 65 F.3d 37, 40-41 (5th Cir. 1995), affg. T.C. Memo. 1994-149; Joyce v. Year Invs., Inc., 196 N.E.2d 24, 26 (Ill. App. Ct. 1964).  We therefore conclude that such an order would not have been improper in the terms of 1 Restatement, Contracts 2d, sec. 176 (1981).  Thus, neither under New Jersey law nor under some putative distinct Federal common law was there duress.  Inasmuch as the result is the same whether we apply New Jersey law or some distinct Federal rule, we need not decide which law governs the question of duress for the purpose of determining the validity of a joint return.

Although Alice Berger attached a disclaimer to the 1988 Form 1040 return that she signed, she did not alter the preprinted jurat in such a way as to invalidate the return as a joint return.  Cf. Sloan v. Commissioner, 102 T.C. 137 (1994), affd. 53 F.3d 799 (7th Cir. 1995).  Thus, we hold that the 1988 return was a valid joint return.[11]

---

[11]Because no party made the argument, we do not consider at length whether the open-endedness of the joint and several liability under a joint return rendered unenforceable Alice Berger's agreement to sign a joint return.  Suffice it to say that, under the test of Town of Newton v. Rumery, 480 U.S. 386, 391-392 (1987), the relevant consideration would appear to be whether any public harm resulting from forcing her to honor her agreement would outweigh the benefits of doing so.  Cf. United States v. Northrop Corp., 59 F.3d 953, 958-963 (9th Cir. 1995). Under that test, her agreement was clearly enforceable.

Issue 3.  Ownership of Woodbine

The questions for decision on this issue are who owned the Woodbine assets and business from the beginning of 1988 through March 14, 1989, and thereafter, until November 17, 1989.  The answers to these questions should enable us to allocate the tax liabilities on the Woodbine income for those periods and on the gain from the sale of Woodbine to the Kunkowskis.

Income is taxable to the taxpayer who earns and controls it. Lucas v. Earl, 281 U.S. 111 (1930).  "The choice of the proper taxpayer revolves around the question of which person or entity in fact controls the earning of income rather than who ultimately receives the income."  Vercio v. Commissioner, 73 T.C. 1246, 1253 (1980) (service income assigned to trust).  The owners of land may be different from the owners of a business located on the land.  See Crawford v. Commissioner, T.C. Memo. 1984-433 (land and farm separate); Blunt v. Commissioner, T.C. Memo. 1966-280 (separating mortuary business from land).

To decide when a transfer is complete for tax purposes, we examine all the surrounding facts and circumstances, no single one of which is controlling.  Baird v. Commissioner, 68 T.C. 115, 124 (1977).  The focus of our inquiry, however, is on when the benefits and burdens of ownership have shifted.  Id.  Generally, a transfer is complete upon the earlier of the transfer of title or the shift of the benefits and burdens of ownership.  Deyoe v. Commissioner, 66 T.C. 904, 910 (1976) (citing Dettmers v.

Commissioner, 430 F.2d 1019, 1023 (6th Cir. 1970), affg. Estate of Johnston v. Commissioner, 51 T.C. 290 (1968)).

In a Federal tax controversy, State law controls the determination of the taxpayer's interest in the property, and the tax consequences are then determined under Federal law. United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985) (and cases cited and quoted therein). To decide when equitable title (i.e., the benefits and burdens of ownership) passes, we consider the following factors under State law: (1) Legal title; (2) intent of parties; (3) equity in property; (4) existence of present obligation to complete transfer; (5) right of possession; (6) party paying property taxes; (7) party bearing risk of loss; and (8) party receiving profits from operation and sale of property. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981); Spyglass Partners v. Commissioner, T.C. Memo. 1995-452.

Although Howard Berger and Alice Berger had held joint legal title to the Woodbine property since October 26, 1983, Alice Berger did not participate in the operation of the Woodbine business prior to Howard Berger's illness in June 1986. Neither had she received any benefits from her ownership interest in the Woodbine property during the years of the marriage prior to June 1986, other than indirectly through the support and maintenance she received from Howard Berger. After Howard Berger's illness, and the breakup of the marriage, however, her involvement in the

business increased, and she began to receive payments directly from the Woodbine business account.

Although Alice Berger never participated in the day-to-day operations of the Woodbine business after June 1986, neither did Howard Berger.  Cf. Blunt v. Commissioner, supra (joint owner of real estate was sole and active operator and owner of the business).  Gregg Kunkowski managed the operations, soliciting customers, negotiating contracts with customers and contractors, paying the bills, and keeping the books and records.  He approached the Bergers only for major decisions.

In 1986, Gregg Kunkowski presented an employment proposal to Dr. Forgotson, Alice Berger's attorney, who drafted an employment agreement.  On December 1, 1986, Alice Berger signed the agreement (as did Howard Berger)

> between ALICE BERGER and HOWARD BERGER, husband and wife, and owners of the Woodbine Cemetery and Mausoleum, * * * hereinafter referred to as the "employers", and GREGG KUNKOWSKI, * * * hereinafter referred to as the "employee".

By presenting the employment agreement to Alice Berger's representative, Gregg Kunkowski treated Alice Berger as an owner of the business.  By signing the employment agreement, Alice Berger bound herself to the terms of the agreement and evidenced her acceptance of the benefits and burdens of her joint ownership of the Woodbine business.

By September 22, 1987, Alice Berger exercised enough control over the Woodbine business to order Gregg Kunkowski to stop

making payments to Howard Berger. Gregg Kunkowski appeared to believe that Alice Berger had the authority to do so because he stopped making the payments, see Tucker v. Commissioner, T.C. Memo. 1983-456 (comparing owners' participation in, and control of, the business), until the Chancery Court ordered him to resume them.

Throughout the divorce proceedings, Alice Berger represented to the Chancery Court that she and Howard Berger jointly owned Woodbine, and that the weekly payments from the Woodbine business account were in addition to alimony pendente lite.

During 1988, Alice Berger withdrew $45,578 from the Woodbine business account, and from January 1 until March 14, 1989, she withdrew $7,560. During 1988, Howard Berger withdrew $42,676 from the Woodbine business account, and from January 1 until March 14, 1989, he withdrew $7,795.

During 1988 and until March 14, 1989, Howard and Alice Berger shared the benefits of the Woodbine business, and Alice owned the Woodbine business jointly with Howard.

Although full legal title to the Woodbine real property was not transferred to Alice Berger until June 23, 1989, the settlement agreement of March 14, 1989, transferred all the benefits and burdens of the Woodbine property and business to Alice Berger. See Deyoe v. Commissioner, supra. Thereafter, Howard Berger no longer received weekly payments or had his expenses paid by Woodbine, except those expenses that had already

accrued, whereas Alice Berger continued to have her expenses paid through the Woodbine business account and increased her weekly draw payments to $1,000, receiving more than $50,000 after March 14, 1989. Alice Berger also received the entire proceeds of sale of Woodbine in the form of the Kunkowskis' installment note, and she has been receiving payments of interest and principal on the note in their entirety ever since.

Alice Berger's assertion that she was merely an accommodation party is belied by the fact that, without consulting Howard Berger, who she asserts was the actual owner of Woodbine, she doubled her draw. She also did not transfer Woodbine directly to the Kunkowskis, as was required by the sale agreement and the settlement agreement. Instead, she entered into a relatively complicated transaction, transferring the business and property to the Woodbine Association in exchange for Certificates of Debt in the Woodbine Association, and then transferring the Certificates of Debt to Gregg and Julia Kunkowski in exchange for their promissory note. We don't believe that Alice Berger would have entered into such a complicated transaction if she were merely an accommodation party.

Alice Berger was contractually bound to sell Woodbine to Gregg and Julia Kunkowski, but she had bound herself to sell it only if and to the extent it was awarded to her. Howard Berger would have been similarly bound if Woodbine had been awarded to

him.  Alice Berger was awarded Woodbine; she alone reaped the benefits of ownership from March 14 until November 17, 1989.

Among the eight factors under State law recited by Grodt & McKay Realty, Inc. v. Commissioner, supra, only factor (1), legal title (and that only to the extent of one-half ownership of the real property), clearly remained with Howard Berger in the period between March 1 and June 23, 1989.  We have just seen that for purposes of factor (8), Alice Berger was the party receiving profits from the operation and sale of the property during that period.  In addition, the terms of the settlement agreement rendered the transfer of full ownership to Alice Berger legally enforceable, for purposes of factor (4); gave her the right of possession, for purposes of factor (5); probably transferred to her the risk of loss, for purposes of factor (7); and left her with the obligation to pay property taxes, for purposes of factor (6).  The terms of the settlement agreement also manifested the intent of the parties to complete the transfer, for purposes of factor (2), which was done in due course.[12]  This leaves only the acquisition of an equity in the property, factor (3),

---

[12]Alice Berger tries to make something of the fact that the transfer documents of June 23 and Nov. 17, 1989, were nothing more than conveyances of real property.  She argues that she never received and never transferred the Woodbine business, including the bank accounts and receivables, and so she should not be taxed on the income of the business, nor treated as having sold these assets.  We are satisfied, however, on the basis of the entire record, that she had the benefits and burdens of ownership of the business during the period Mar. 14-Nov. 17, 1989, as evidenced by the substantial draw payments she received during this period, and that the $680,000 price she received was based on the Woodbine assets and business in their entirety.

indeterminate, but it would appear to us to follow the other factors that would attribute the full ownership of Woodbine to Alice Berger after March 14, 1989.

Howard and Alice Berger owned the Woodbine property and business jointly during 1988 and until March 14, 1989. Thereafter Alice Berger was the sole owner of the Woodbine property and business until the sale of November 17, 1989.

Issue 4(a). Method of Accounting for Mausoleum Sales and Costs

Generally, a taxpayer computes taxable income using the same method of accounting that he or she regularly uses to compute income in keeping the books. Sec. 446(a). A taxpayer may use "(1) the cash receipts and disbursements method; (2) an accrual method; (3) any other method permitted by this chapter; or any combination of the foregoing methods permitted under regulations prescribed by the Secretary." Sec. 446(c). The regulations permit "any combination of * * * [the cash, accrual, or other permissible] methods of accounting * * * if such combination clearly reflects income and is consistently used." Sec. 1.446-1(c)(1)(iv), Income Tax Regs. A method of accounting includes both the taxpayer's overall method of accounting and the method of accounting for any item. Burck v. Commissioner, 63 T.C. 556, 561 (1975), affd. 533 F.2d 768 (2d Cir. 1976); sec. 1.446-1(a), Income Tax Regs.

If a taxpayer changes the method of accounting regularly used to compute income in keeping the books, the taxpayer must

secure the consent of the Secretary before computing taxable income under the new method. Sec. 446(e). Adoption of a method of accounting for a new trade or business is not a change in the method of accounting. Sec. 1.446-1(e)(1), Income Tax Regs. Use of a method of accounting different from a taxpayer's overall method of accounting is also not a change in the method of accounting if it results from a change in underlying facts. Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. For a different method of accounting to be a change, "the item itself must be basically the same as an item previously accounted for with the present method of accounting differing from the prior treatment. Unless the transactions are basically the same, the accounting treatment would not be [a] 'change' of accounting but only a 'new' accounting method for a different transaction." Federated Dept. Stores, Inc. v. Commissioner, 51 T.C. 500, 513-514 (1968), affd. 426 F.2d 417 (6th Cir. 1970).

From 1979 through the years in issue, Woodbine's sales of grave plots were recognized when cash was received, and most expenses were recorded when paid. However, the costs of grave plots were inventoried and expensed only as plots were sold.

When construction of the first mausoleum began in 1984, mausoleum crypt sales were accounted for differently. Until construction of the mausoleum was complete, customer payments to purchase crypts were treated as deposits. When the mausoleum was completed, prior payments were recognized as income, and the pro

rata share of construction costs was expensed. Subsequent sales of crypts were then treated similarly to grave plot sales; sales were recorded when cash was received, and the remaining cost of crypts was inventoried and then expensed as the remaining crypts were sold.

Alice Berger asserts that Howard Berger, by using a method of accounting for mausoleum crypt sales different from the method he used for cemetery plot sales, changed Woodbine's accounting method to a method that does not clearly reflect income and that he did so without the Secretary's consent. She therefore concludes that receipts from the sale of crypts were income when received. Howard Berger asserts that the method of accounting adopted for mausoleum crypt sales was not a change in accounting method and that the cash method for grave plot sales and the accrual method for mausoleum crypt sales is a permissible combination of methods that clearly reflects income. Respondent agrees with Howard Berger that there was no change in accounting method, and that, until March 14, 1989, Woodbine used a permissible combination of the cash and accrual methods that clearly reflected income. However, respondent asserts that Howard Berger's 1989 transfer of his interest in the Woodbine business to Alice Berger caused "a triggering of tax to Howard and that a pro-rata portion of the profit attributable to * * * 'deposits' [received prior to the transfer] should be taxed to Howard in 1989."

We find that there was no change in accounting method, that Woodbine's combination of methods clearly reflected income during 1988 and 1989, and that, although section 1041 prevents Howard's March 1989 transfer of his interest in Woodbine to Alice from being treated as a gain recognition event to him, the transfer triggered the accrual of Howard's share of the income from crypt sales that had been previously deferred and that would not have been otherwise includable in income until the completion of the Phase II mausoleum in May 1989.

Sales of crypts during construction significantly differed from sales of cemetery plots. When a cemetery plot was sold, ownership of the plot was transferred to the purchaser at approximately the same time as Woodbine received cash. The plot was ready for excavation and use, and Woodbine's cost of the sale was known. On the other hand, when a mausoleum crypt was sold during construction, ownership of the crypt was not transferred and the crypt was not ready for occupancy until the mausoleum building was completed. Prior to completion of the mausoleum, Woodbine's cost of sale of crypts could only be estimated.

Because sales of crypts significantly differed from sales of plots, the method of accounting adopted for crypt sales was neither a change in the overall method of accounting nor a change in the treatment of a material item. The method of accounting for crypt sales was a new method of accounting for a different item. Because the new accounting method was not a change in

method, the Secretary's consent was not required.  Sec. 1.446-
1(e)(2)(ii)(b), Income Tax Regs.

We now discuss why the different method of accounting for
mausoleum crypt sales clearly reflected income.  Sec. 1.446-
1(a)(2), Income Tax Regs.  Alice Berger cites Evergreen Cemetery
Association v. Burnet, 45 F.2d 667 (D.C. Cir. 1930), affg. 13
B.T.A. 638 (1928), for the proposition that "Where forfeiture of
the deposit will result from a breach of the contract by the
customer, the deposit is taxed in the year of receipt."  Alice
Berger asserts that "In Evergreen, the court held that periodic
payments received pursuant to contracts for the sale of mausoleum
crypts during the construction phase were taxable when received
regardless of when construction was completed".  We disagree.

The taxpayer in Evergreen Cemetery Association v. Burnet,
supra, kept its books on an accrual basis.  The taxpayer had sold
crypts in 1920 before its mausoleum was completed, and in 1921,
the year the mausoleum was completed.  Purchasers were allowed to
pay for crypts over time, and at the end of 1921, not all of the
crypts had been paid for in full.  For 1921, the taxpayer
included in income the cash collected during 1920 and 1921 but
did not include the unpaid amounts.  This accounting method was
improper because "the entire sales price of all crypts sold by it
had accrued in the year 1921".  Id. at 669.  Although the court
in Evergreen Cemetery Association did not directly address the
propriety of including 1920 sales in 1921 gross receipts, it

implicitly agreed that the income from crypt sales was taxable in the year the mausoleum was completed, regardless of when the cash had been collected.

Generally, when property is exchanged for cash, the receipt of cash clearly reflects the receipt of income from the sale of the property. However, when cash is received in exchange for a promise to transfer property that is not yet constructed, the amount or existence of income is less clear. As to the crypt sales in issue, a pure cash receipts and disbursements method of accounting would recognize income from the sale of a crypt when cash is received but would delay deduction of the cost of construction until the cash is spent, certainly not a clear reflection of income. See Rotolo v. Commissioner, 88 T.C. 1500, 1514 (1987) ("'the cost of goods sold must be deducted from gross receipts in order to arrive at gross income'" (quoting Sullenger v. Commissioner, 11 T.C. 1076, 1077 (1948))); see also Veenstra & DeHaan Coal Co. v. Commissioner, 11 T.C. 964 (1948). Until a mausoleum was completed, Woodbine's overall method of accounting would not clearly reflect income from crypt sales. Either the costs of construction would have to be estimated and accrued, and a portion expensed, or the recognition of gross receipts delayed until receipts could be matched with the costs of construction. Neither method would appear to reflect income more clearly than the other. Without a showing either that Woodbine's overall method of accounting would clearly reflect income from mausoleum

crypt sales or that the method of accounting adopted for such sales does not clearly reflect income, we will not change the accounting method that was consistently used for crypt sales during the previous 4 years and that had been implicitly authorized by respondent. Sec. 1.446-1(c)(2)(ii), Income Tax Regs.

As a result, we reject Alice Berger's efforts to accelerate part of Phase II mausoleum crypt sale income into 1988 and to make it solely taxable to Howard Berger on the ground that she was not a party to the 1988 joint return.

Issue 4(b). Recognition of Income Upon Transfer of Woodbine

Respondent argues that Howard Berger's transfer to Alice pursuant to their settlement agreement is similar to the transfers of partially completed construction contracts by the corporations in Jud Plumbing & Heating, Inc. v. Commissioner, 153 F.2d 681 (5th Cir. 1946) (liquidating corporation), affg. 5 T.C. 127 (1945), and Standard Paving Co. v. Commissioner, 190 F.2d 330 (10th Cir. 1951) (nontaxable reorganization), affg. 13 T.C. 425 (1949). Respondent argues that, as a result of Howard's transfer, the method of accounting for mausoleum crypt sales that we have accepted no longer clearly reflected income, at least as to him. Respondent relies on section 1.451-5(f), Income Tax Regs., to justify substituting a percentage of completion method to account for Howard's share of the income from Phase II mausoleum crypt sales for 1989. Although Alice Berger disagrees

with the assertions of Howard and respondent that she had or acquired any ownership interest in the Woodbine property and business, she concurs with respondent's general position on the application of Jud Plumbing and Standard Paving, and argues, under the assignment of income principle, that the deposits would be income to Howard Berger as of the date of transfer. Howard Berger now repudiates his 1989 return position and asserts that the transfer of his remaining one-half interest in the Woodbine property and business was a nontaxable transfer of property under section 1041, not an assignment of income, and that Jud Plumbing does not apply.

We hold that section 1041 does not trump clear reflection of income in the peculiar factual circumstances of this case. As a result, Howard Berger will be required to accrue a share of income from Phase II mausoleum crypt sales for 1989, even though he transferred his one-half interest in Woodbine in March 1989, 2 months prior to the completion of the Phase II mausoleum. However, by reason of section 1041, he recognized no gain on that transfer or on Alice Berger's subsequent sale of Woodbine to the Kunkowskis.

Section 1041 was enacted by section 421 of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 793-795. It provides as a general rule that

> No gain or loss shall be recognized on a transfer of property from an individual to * * *
>
> (1) a spouse, or

(2) a former spouse, but only if the transfer is
incident to the divorce.

Section 1041 is effective generally for transfers after July 18,
1984, in taxable years ending after such date; see DEFRA sec.
421(d), 98 Stat. 795.

Prior to the enactment of section 1041, the resolution of
property rights incident to a divorce gave rise to differing tax
results, depending on how each spouse's rights and obligations
were viewed for State law purposes.  The Supreme Court had ruled
that a transfer of separately owned appreciated property to a
spouse (or former spouse) in exchange for the release of marital
claims resulted in the recognition of gain to the transferor.
United States v. Davis, 370 U.S. 65 (1962).  However, upon an
approximately equal division of community property on divorce, no
gain was recognized on the theory that there was only a
nontaxable partition, not a sale or exchange.  Carrieres v.
Commissioner, 64 T.C. 959, 964 (1975), affd. per curiam 552 F.2d
1350 (9th Cir. 1977); see also Siewert v. Commissioner, 72 T.C.
326, 332-333 (1979).  The Commissioner applied a like result to
the partition of jointly held property.  See Rev. Rul. 74-347,
1974-2 C.B. 26.  The tax treatment of divisions of property
between spouses involving other various types of ownership under
the different State laws was often unclear and resulted in much
litigation.  See H. Rept. 98-432 (Part 2), at 1491 (1984).
Several common law States had tried to avoid the result in the
Davis case by amending and bending their property and equitable

distribution laws.  Id.

Congress was dissatisfied with the resulting patchwork and desired to make the Federal tax law less intrusive into marital property relationships.  Id. at 1492.  Section 1041 was the result.  The Ways and Means Committee explained

> that the transfer of property to a spouse incident to a divorce will be treated, for income tax purposes, in the same manner as a gift.  Gain (including recapture income) or loss will not be recognized to the transferor, and the transferee will receive the property at the transferor's basis (whether the property has appreciated or depreciated in value). * * * This nonrecognition rule applies whether the transfer is for the relinquishment of marital rights, for cash or other property, for the assumption of liabilities in excess of basis, or for other consideration and is intended to apply to any indebtedness which is discharged.  Thus, uniform Federal income tax consequences will apply to these transfers notwithstanding that the property may be subject to differing state property laws.  [Id.; fn. ref. omitted.]

An assignment of income is generally disregarded unless the underlying income-producing property is also transferred.  See generally, 3 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, ch. 75 (2d ed. 1991 & Supp. 1995).  Usually there is no property underlying personal service income so that assignment of personal service income is disregarded, and the taxpayer who earned the income is taxed on it under Lucas v. Earl, 281 U.S. 111 (1930).  In this case, property (a one-half interest in Woodbine) was transferred, subject to contracts for sale of mausoleum crypts and related receivables and deposit liabilities.  Cf. Kochansky v. Commissioner, T.C. Memo. 1994-160

(contingent legal fee taxable to lawyer who earned it, not spouse who was awarded it).  But see Siegel v. United States, 464 F.2d 891, 894 (9th Cir. 1972) ("the line between earned income and income from property is not always marked with dazzling clarity").

Even though there may be a personal service element in the income from the operation of a cemetery, this record provides no factual basis for separating that element from the income from mausoleum crypt sales, nor do we see any proper theoretical ground for doing so.  Moreover, Howard and Alice had both delegated the management and operation of Woodbine to Gregg Kunkowski.

Respondent's position that the assignment of income principle can apply to transfers of property with economically accrued income elements, see Rev. Rul. 87-112, 1987-2 C.B. 207, so as to trump section 1041, has been criticized as "an unfortunate step backward into the judicial confusion created by the Davis rule".  McCaffery & Salten, Structuring the Tax Consequences of Marriage and Divorce, sec. 604, at 144 (1995) (citing Asimow, "The Assault on Tax-Free Divorce: Carryover Basis and Assignment of Income", 44 Tax. L. Rev. 65, 91-112 (1988)).  But see Gabinet, "Section 1041: The High Price of Quick Fix Reform in Taxation of Interspousal Transfers", 5 Am. J. Tax Pol. 13 (1986).  The concerns expressed by McCaffery & Salten, supra at 145, extend beyond the resulting uncertainty for parties

negotiating marital settlements to include the unfairness of immediately triggering income before cash is in hand and even causing income actually paid to one spouse to be attributed to the other.

In Balding v. Commissioner, 98 T.C. 368 (1992), we rejected the Commissioner's reliance on the assignment of income doctrine to conclude that the payments a former wife received in settlement of her claim to a community property interest in her husband's military pension were nontaxable gifts under sections 1041 and 102.

In the absence of section 1041, we would not hesitate to uphold respondent's reliance on Jud Plumbing & Heating v. Commissioner, 153 F.2d 681 (5th Cir. 1946), to apply the clear reflection of income rule to require Howard Berger to use the percentage of completion method to determine his share of the Woodbine income as of the time of the transfer. Jud Plumbing and Standard Paving Co. v. Commissioner, 190 F.2d 330 (10th Cir. 1951), are only a couple of examples of the numerous occasions on which a taxpayer winding up its existence as a tax-paying entity was required to include income in its final taxable year under the clear reflection of income rule, even though its otherwise proper method of accounting would not have otherwise required inclusion in that year. See Stephens Marine, Inc. v. Commissioner, 430 F.2d 679, 687 (9th Cir. 1970), affg. T.C. Memo. 1969-39; Idaho First Natl. Bank v. United States, 265 F.2d 6 (9th

Cir. 1959); <u>J.M. Turner & Co. v. Commissioner</u>, 247 F.2d 370, 373 (4th Cir. 1957), revg. and remanding on other grounds 26 T.C. 795 (1956); <u>Floyd v. Scofield</u>, 193 F.2d 594 (5th Cir. 1952); <u>United States v. Lynch</u>, 192 F.2d 718 (9th Cir. 1951); <u>Commissioner v. Carter</u>, 170 F.2d 911 (2d Cir. 1948), affg. 9 T.C. 364 (1947); see also <u>Palmer v. Commissioner</u>, 29 T.C. 154 (1957) (clear reflection of income trumps nonrecognition under section 351, whereas section 351 generally trumps assignment of income, Rev. Rul. 80-198, 1980-2 C.B. 113, 114-115 (citing <u>Hempt Bros. v. United States</u>, 490 F.2d 1172 (3d Cir. 1974))), affd. 267 F.2d 434, 438-439 (9th Cir. 1959). See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.17, at 3-82 to 3-86 (6th ed. 1994).

The termination of Howard Berger's performance obligation to purchasers of Phase II mausoleum crypts, see sec. 1.451-5(f), Income Tax Regs., makes it appropriate to apply <u>Jud Plumbing</u> and section 446(b) to his March 14, 1989 transfer. This is a situation contemplated by section 1.451-5(f), Income Tax Regs., in which "in a taxable year [1989]" Howard's "liability under the agreement [the Phase II mausoleum crypt sales contracts] otherwise ends", so as to make it appropriate that "so much of the advance [payments] as was not includable in his gross income in preceding taxable years shall be included in his gross income for such taxable year [1989]".

Any concerns about unfair income triggering and

misattribution of deferred income need not detain us.  At the
time of the transfer from Howard to Alice on March 14, 1989, less
than 2 months remained before the Phase II mausoleum would be
completed, and the bulk of the pre-completion deposits was
already in hand.  During all of 1987 and 1988 and for the first
10 weeks of 1989, Howard Berger had received draw payments of
$500 per week, plus payments of personal expenses, that were
primarily financed by those deposits.  No misattribution results
from taxing Howard on one-half the income attributable to Phase
II mausoleum crypt sales prior to his March 1989 transfer.

It follows that Howard Berger's taxable income from the
operations of Woodbine includes not only his one-half share of
the operating profits of Woodbine for the period from January 1
through March 14, 1989, computed under Woodbine's method of
accounting, but also a portion of the income from the Phase II
mausoleum crypt sales.  Howard Berger has not furnished "the
cogent proof" that would require us to reduce the $175,142 of net
income that he reported from the Woodbine business for this
period in 1989.  See Estate of Hall v. Commissioner, 92 T.C. 312,
337-338 (1989); Nestle Holdings, Inc. v. Commissioner, T.C. Memo.
1995-441, 70 T.C.M. 683, 707, 1995 RIA TC Memo par. 95,441 at
95-2730.  Consequently, we hold him to the initial admission in
his 1989 return as to the measure of his Woodbine income,
including his share of the Phase II crypt sale income.[13]

_____

[13]The Estate of Howard Berger now takes the position that in
(continued...)

Respondent would tax Howard under our 50-percent allocation to him on $145,204 of profit on mausoleum deposits, plus $21,646, his 50-percent share of other cemetery income and interest income, for a total of $166,850. This is not much less than the amount reported by Howard on his 1989 joint return. We believe that respondent's approach to taxing Howard Berger is supported by the parties' stipulations as to the amounts of Phase II mausoleum crypt sales deposits and costs that would be taxed on a percentage of completion basis, as of March 14, 1989, to a 50-percent owner. We treat respondent's argument as a concession, and reduce Howard Berger's 1989 Schedule C Woodbine income from $175,142 to $166,850.

We therefore treat Alice Berger as having received the remainder of Woodbine's taxable income for 1989. Inasmuch as the parties have agreed that the total taxable income of Woodbine for the period in 1989 through November 17, 1989, amounted to $383,133, Alice Berger is taxable on the remainder of $216,283. It's not unfair to tax Alice Berger on that amount of Woodbine operating income for 1989. Until March 14, 1989, she received the same monthly draw payments as Howard Berger. Thereafter,

---

[13](...continued)
1989 he should be taxed only on $22,853 of Woodbine income, which approximates the following amounts of pre-March 14, 1989 income:

| | |
|---|---|
| Cemetery income | $36,030.36 |
| Interest income | 7,262.19 |
| | 2)43,292.55 |
| | 21,646.28 |

This is the basis for Howard Berger's argument that he and Susan Berger have a substantial overpayment for 1989.

until November 17, 1989, she received draw payments from Woodbine at $1,000 per week and total payments of $53,844, and Howard Berger received only $2,239 on account of personal expenses that had previously accrued. Under our approach, Alice Berger's 1989 Woodbine taxable income exceeds Howard Berger's 1989 taxable income by approximately $50,000, the amount by which Alice Berger's draw payments and withdrawals made after March 14, 1989, exceeded the payments to Howard Berger during the same period:

|   |   | Woodbine 1989 Taxable Income |
|---|---|---|
| 1. | Total taxable income | $383,133 |
| 2. | Alice Berger | -216,283 |
| 3. | Howard Berger | 166,895 |
| 4. | 2 minus 3 | 49,431 |

Issue 5(a). Whether Alice Berger or Howard Berger Is Required to Recognize Gain From the Sale of Woodbine in 1989

It appears to be undisputed by the parties that the sale transactions of November 17, 1989, should be treated as a direct sale of Woodbine to the Kunkowskis in exchange for their installment note to Alice Berger.

Alice Berger argues that section 1041 does not apply because the sale to the Kunkowskis was a transfer to third parties on behalf of a spouse and thus falls under section 1.1041-1T, Q&A-9, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984). For this conclusion, she largely relies on Arnes v. United States, 981 F.2d 456 (9th Cir. 1992). However, this Court concluded in Blatt v. Commissioner, 102 T.C. 77, 82 (1994), that

Arnes v. United States, supra, had been wrongly decided.[14]  Under the test that we expressed in Blatt v. Commissioner, supra at 81, "A transfer that satisfies an obligation or a liability of someone is a transfer on behalf of that person".  Alice Berger's sale of Woodbine to the Kunkowskis does not represent a sale on behalf of Howard Berger, and thus section 1041 does not attribute to Howard any gain realized by Alice on her sale of Woodbine to the Kunkowskis.

Alice Berger asserts that "both parties, Alice and Howard, were obligated to transfer Woodbine to the Kunkowskis".  However, neither Howard nor Alice was obligated to sell Woodbine until an award was entered by the Chancery Court.  The settlement agreement stated that whoever was awarded Woodbine would immediately sell it to the Kunkowskis.  Howard Berger was not awarded Woodbine and so was never obligated to sell it to the Kunkowskis.  We disagree with Alice's argument that her sale to the Kunkowskis was made on behalf of Howard.

Alice Berger also argues that section 1041 does not apply because the sale to the Kunkowskis was part of a step transaction on behalf of Howard, and that, therefore, he must recognize gain on the transfer of Woodbine to Alice.  Alice also asserts that

---

[14]See also Arnes v. Commissioner, 102 T.C. 522 (1994).  It is unclear to what Court of Appeals appeal in this case would lie, but it would almost certainly not be to the Court of Appeals for the Ninth Circuit.  Therefore Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), does not constrain us to follow Arnes v. United States, 981 F.2d 456 (9th Cir. 1992).

the step-transaction doctrine applies to collapse the transfer of the Woodbine assets and business from Howard to Alice to Woodbine Association to Gregg and Julia Kunkowski into a direct transfer from Howard to the Kunkowskis.

As for the step-transaction doctrine, section 1.1041-1T(a), A-2, Example (3), Temporary Income Tax Regs., 49 Fed. Reg. 34452 (Aug. 31, 1984), does say that the step-transaction doctrine may apply to section 1041 in appropriate circumstances.  However, the regulation addresses the use of the step-transaction doctrine to extend, rather than limit, the sweep of section 1041.  A-2 as a whole says that section 1041 applies to all transfers of property between spouses, not just those incident to divorce.  Example (2) says that this includes transfers between one spouse and a sole proprietorship owned by the other spouse.  Example (3) says that section 1041 does not apply to transfers between one spouse and a corporation wholly owned by the other.  Example (3) then goes on to say that in appropriate circumstances general tax principles, including the step-transaction doctrine, may apply to recharacterize the transaction.  The regulation appears to contemplate that such general principles could be used in appropriate circumstances as a basis for applying section 1041. To use the step transaction doctrine to limit the scope of section 1041 in the circumstances of this case would be unwarranted.  Indeed, we have already found that Alice Berger alone reaped the benefits of the ownership of Woodbine from March

14, 1989, when Howard's beneficial ownership ceased, until November 19, 1989, when she sold Woodbine to the Kunkowskis.

Neither of Alice Berger's arguments carries the day. Section 1041 operates to make her liable for tax on the entire gain realized on the sale of Woodbine to the Kunkowskis.

Issue 5(b). Adjusted Basis of the Woodbine Property and Business

To calculate Alice Berger's gain, we must ascertain her basis. Respondent determined that the adjusted basis of the Woodbine property and business was no greater than $75,945, as reflected by the total assets shown on the books and records of Woodbine as of November 17, 1989.

Alice Berger argues that her adjusted basis should be increased by $100,000, the amount paid for Woodbine by Howard Berger in 1979, and by the amount of the unrealized receivables on the books of Woodbine on the date of the March 14, 1989, transfer. We consider these arguments, and also whether her adjusted basis should be increased by any income accrued to Howard Berger upon his transfer of March 14, 1989, to her and by her as a result of her income accrued on the completion of the Phase II mausoleum in May 1989.

The original $100,000 purchase price of the Woodbine assets and business was already included in Woodbine's books and records. The original purchase price was allocated among grave plots, buildings, equipment, and goodwill. The goodwill was not amortized and remained on Woodbine's books. Buildings and

equipment had been subject to depreciation from 1979 until November 17, 1989, and their bases had been appropriately reduced on Woodbine's books. Grave plots were held as inventory on Woodbine's books and were expensed as they were sold. We conclude that Howard Berger's original $100,000 cost had been reduced, as a result of depreciation, and increased--to reflect the unrecovered costs of unsold mausoleum crypts and cremation niches--to $75,945, the amount on Woodbine's books on November 17, 1989, the date of Alice Berger's sale to the Kunkowskis.

We next consider whether Howard Berger's accrual of deposit income on his transfer of March 14, 1989, to Alice changes the basis of the Woodbine property and business in her hands.

Section 1041(b) provides that after a transfer incident to divorce the basis of the transferee in the property shall be the adjusted basis of the transferor. Sec. 1.1041-1T(d), A-11, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), describes the treatment of the transferee of property under section 1041 as follows:

> The transferee of property under section 1041 recognizes no gain or loss upon receipt of the transferred property. <u>In all cases, the basis of the transferred property in the hands of the transferee is the adjusted basis of such property in the hands of the transferor immediately before the transfer.</u> Even if the transfer is a bona fide sale, the transferee does not acquire a basis in the transferred property equal to the transferee's cost (the fair market value). This carryover basis rule applies whether the adjusted basis of the transferred property is less than, equal to, or greater than its fair market value at the time of transfer (or the value of any consideration provided by

> the transferee) and applies for purposes of determining
> loss as well as gain upon the subsequent disposition of
> the property by the transferee.  Thus, this rule is
> different from the rule applied in section 1015(a) for
> determining the basis of property acquired by gift.
> [Emphasis added.]

On the basis of this regulation (and of the words of section 1041(b)), we decided in Godlewski v. Commissioner, 90 T.C. 200, 206 (1988), that a husband who bought title to their house from his former wife for $18,000 under the terms of a divorce agreement could not increase his basis in the house under section 1041 by the $18,000 that he paid her.  Our conclusion was based on the assumption, properly adopted in that case, that a transfer subject to section 1041 is a nonrecognition event to both transferor and transferee.  However, section 1041(e), enacted in 1986, after section 1041 had been enacted in 1984, provides for recognition of gain on transfers that would otherwise be nonrecognized under section 1041(a), if (1) the transfer is in trust and (2) liabilities assumed or encumbering the property exceed the adjusted basis.  It further provides that "Proper adjustment shall be made under subsection (b) in the basis of the transferee in such property to take into account gain recognized by reason of the preceding sentence"; i.e., that the transferee's basis is adjusted to reflect any gain recognized upon the transfer by the transferor.

The structure of section 1041, as amended, would therefore appear to support by analogy adjusting Alice Berger's carryover

basis in Woodbine to reflect the taxable income accrued to Howard Berger under section 446(b) and Jud Plumbing & Heating v. Commissioner, 153 F.2d 681 (5th Cir. 1946), by reason of his transfer of March 14, 1989, to her. We believe that her basis should be so adjusted.

We therefore distinguish Godlewski v. Commissioner, supra, which involved a transfer on which no gain or other income was recognized by either spouse. What Godlewski really rejects is treating the transfer of the interest in the house in question as a sale when section 1041(b) dictated that it should be treated as a gift. Making adjustments to the basis in Woodbine in our case to reflect Howard's income accrual on his transfer to Alice does not present the same difficulty.

In order to determine Alice Berger's gain upon the transfer of Woodbine to the Kunkowskis, we should make all adjustments to the basis of Woodbine that are properly attributable to capital account up to the time of that transfer. Secs. 1016(a), 7701(a)(42)-(44); United States v. Hill, 506 U.S. 546, 555 (1993); Ayer v. Commissioner, 37 B.T.A. 767, 778 (1938), vacated on other grounds 100 F.2d 850 (1st Cir. 1939); sec. 1.1016-2(a), Income Tax Regs. Proper adjustments are to be made for the period of joint ownership by both Howard and Alice Berger, for the income accrued when Howard Berger's interest was transferred to Alice Berger, and for the subsequent period of sole ownership by Alice Berger. Some of these adjustments, as we have seen,

have already been accounted for in respondent's figure of $75,945. However, those not so accounted for include: (1) The income, from whatever Woodbine-associated source, that Howard Berger must accrue or had otherwise included no later than the time of the transfer of his interest to Alice Berger (to be added to basis); (2) the deposit income that Alice must accrue upon the completion of the Phase II mausoleum and her other income from the operation of Woodbine (also to be added to basis); (3)(a) the draw payments and payments of Howard's expenses by Woodbine (to be subtracted from basis) and (b) the similar payments by Woodbine to or on behalf of Alice (also to be subtracted from basis).[15] All these adjustments must be made to the Woodbine basis of $75,945 before we can determine Alice Berger's adjusted

---

[15]That the adjustments upward for (1) and (2) are appropriate should be clear from the above discussion. The same is true for the adjustments downward for (3) and (4). Neither Howard nor Alice Berger reported any of the draw payments as taxable income, and they were right not to do so. However, now that we must determine Alice Berger's gain on the sale to the Kunkowskis, the draw payments can no longer be ignored for tax purposes. We must make the same changes to the basis of Woodbine that we would make to the basis of partnership interests in the hands of the partners. With respect to (3) and (4), we will have potential windfalls if we don't make the adjustments predicated upon Howard's and Alice's having received distributions from the Woodbine business that were never taxed to them. Generally, partners don't recognize gain or loss on receipt of cash distributions from a partnership, sec. 731(a), but a partner's basis in his partnership interest (outside basis) is reduced by the amount of any money distributed by the partnership, secs. 705(a)(2), 733, provided the amounts he receives from the partnership do not exceed his outside basis, sec. 731(a)(1). The same is true here of Howard's and Alice's interests in Woodbine.

basis in Woodbine and her taxable gain on the sale to the Kunkowskis. Because the record does not enable us to ascertain all the figures, we leave the details to the Rule 155 computation.

Before leaving the subject of basis, we address the Woodbine receivables, which were omitted from the Woodbine 1989 balance sheet that showed the unrecovered cost of the Woodbine assets to be $75,945. The accounts receivable generated by the sale of mausoleum crypts were ordinary income assets[16] in the hands of Howard and Alice Berger. Sec. 1221(1); Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976) (land option, ordinary income); McHugh v. Commissioner, T.C. Memo. 1957-4 (land contracts, ordinary income). They had a zero basis in the hands of Alice Berger to the extent they had not been properly taken into Woodbine income by Howard at the time of his transfer of March 14, 1989, to Alice, and by Alice, at the time of the completion of the Phase II mausoleum. Bongiovanni v. Commissioner, 470 F.2d 921, 923 (2d Cir. 1972) (zero basis), revg. on other grounds T.C. Memo. 1971-262; Hempt Bros., Inc. v. United States, 354 F. Supp. 1172, 1177 (M.D. Pa. 1973) (zero

---

[16]The test for whether income from sales of land is ordinary income or capital gain is whether (1) the taxpayer was engaged in the trade or business, (2) whether the taxpayer held the property primarily for sale in the business, and (3) whether the sales contemplated by the taxpayer were "ordinary" in the course of that business. Bramblett v. Commissioner, 960 F.2d 526, 530 (5th Cir. 1992), revg. T.C. Memo. 1990-296. Under this test, Woodbine receivables from crypt sales were ordinary income assets.

basis), affd. on other grounds 490 F.2d 1172 (3d Cir. 1974); cf.
sec. 1.1221-2(c)(5)(i), Income Tax Regs.; sec. 1.1221-2T(b)(2),
Temporary Income Tax Regs., 58 Fed. Reg. 54075 (Oct. 20, 1993).

Respondent did not determine and has not asserted--although
there might have been valid grounds for doing so--that unrealized
receivables with respect to Phase II mausoleum crypt sales should
have been accrued prior to or upon completion of the Phase II
mausoleum in May 1989.[17]  It therefore appears that the Woodbine
receivables were not taken into income, under Woodbine's method
of accounting, which respondent has not disturbed, until they
were collected.  As a result, the receivables on hand at the time
of Alice Berger's sale to the Kunkowskis, on November 17, 1989,
had a zero basis in her hands.[18]  It appears that the proceeds of

_____

[17]Cf. Evergreen Cemetery Association v. Burnet, 45 F.2d 667
(D.C. Cir. 1930), affg. 13 B.T.A. 638 (1928), discussed supra pp.
48-49.

[18]It does not escape our notice that there were elements of
financial and tax planning in the structuring of the sale
transaction that do not appear to have been brought to the
attention of Howard or Alice Berger, to the financial and tax
detriment of Alice Berger.

The American Cemetery Consultants appraisal valued the
Woodbine receivables, as of Oct. 1, 1988, which then had a face
amount of $428,600, by deeply discounting them to a fair market
value of $172,298.  The latter figure is the value we have
attributed to the receivables for purpose of allocating the sale
price among the various assets; after all, the $172,298 valuation
of the receivables was used in computing the $680,000 sale price
of Woodbine to be received by Alice Berger.  By causing the
receivables to be transferred to the Cemetery Association, the
Kunkowskis in effect caused the difference between the deeply
discounted value of the receivables, which has been included as
(continued...)

subsequent collection of those receivables by Woodbine has, to a substantial extent, provided the wherewithal for the payments on the Woodbine Association Certificates of Indebtedness held by the Kunkowskis and on the Kunkowskis' note to Alice Berger.

Issue 5(c).  Installment Method

The gain or loss realized by the seller of property usually must be recognized at the time of sale.  However, the seller who is eligible to use the installment method may defer recognition of gain, and the liability to pay tax thereon, over the period of and in proportion to the payments as they are made.  Sec. 453(c). Under the installment method, the seller is able to recognize gain over the period during which the installment payments are

---

[18](...continued)
part of Alice's gain, and their substantially higher face amount, assuming that they were collected by the Cemetery Association in due course over the following 2-year period, with few if any bad debts, to escape tax entirely.  Perhaps that difference, if the receivables should be considered, along with the other Woodbine assets, to have been transferred to the Kunkowskis, and re-transferred by them to the Cemetery Association for its Certificates of Indebtedness, should have been taxed to the Kunkowskis if the receivables in fact had a value greater than $172,298 on Nov. 17, 1989.  If that difference should be so large as to extend the period of limitations under sec. 6501(e) on the Kunkowskis' 1989 return, respondent may still have time to consider that possibility and determine whether the Kunkowskis realized and recognized a substantial ordinary gain on their constructive transfer to the Cemetery Association of the previously undervalued Woodbine receivables from purchasers of Phase II mausoleum crypts.

The transactions of Nov. 17, 1989, were structured for tax purposes in such fashion that, as we shall see in the discussion of issue 5(c), Alice Berger will be required to pay a substantial current tax liability, even though she is receiving the $680,000 sale price in the form of monthly payments, with interest, over 25 years.

received, rather than be taxed on the entire gain in the year of sale. See Leon H. Perlin Co. v. Commissioner, T.C. Memo. 1993-79. Alice Berger claims installment treatment of her entire gain from the sale of Woodbine.

Respondent asserts that the sale on November 17, 1989, of Woodbine was a dealer disposition and therefore does not qualify as an installment sale under section 453.[19] The installment method is not available for dispositions of personal property of a kind required to be included in the inventory of the taxpayer on hand at the close of the taxable year. Sec. 453(b)(2)(B); sec. 15A.453-1(b)(4), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981). The installment method is also not available for a dealer disposition, sec. 453(b)(2)(A), which includes any disposition of real property held by the taxpayer for sale to customers in the ordinary course of trade or business. Sec. 453(b)(2)(A), (l). It would therefore appear to be immaterial for our purposes whether the Woodbine burial rights are classified as personal property or real property.[20]

---

[19]Respondent has not determined or argued for the application of sec. 453(g) or (e), concerning the sale of depreciable property between related persons, and second disposition by related persons, respectively. See generally Shelton v. Commissioner, 105 T.C. 10 (1995).

[20]Whether the sale of burial rights constitutes personalty or realty is generally determined under State law. National Memorial Park, Inc. v. Commissioner, 145 F.2d 1008 (4th Cir. 1944). The Woodbine property and business is located in New Jersey. Under New Jersey case law and statutory law, title to a cemetery plot is a legal estate in real property. N.J. Stat. Ann. sec. 8A:7-2 (West 1987 & Supp. 1995) (burial space passes to
(continued...)

The evidence in the record with respect to the Woodbine burial rights, developed or undeveloped, does not indicate any use of them by Woodbine other than for sale to customers in the ordinary course.  See Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1488 (11th Cir. 1985) (assets sold in the ordinary course of business), affg. in part and revg. and remanding on other issues T.C. Memo. 1981-361.   The Woodbine books and records reflect these assets under an "inventory" classification. So does the appraisal prepared by American Cemetery Consultants. Therefore, the burial rights that had not yet been sold to customers were inventory or property held for sale to customers in the ordinary course of trade or business and not eligible for the installment method.

In identifying dealer dispositions of both personalty and realty, the Code refers to "any disposition".  Sec. 453(l)(1)(A) and (B).  Therefore the sale, whether in bulk or individually, of the burial rights that are normally sold to the public would be a dealer disposition of property.  As a dealer disposition, the sale of those component assets of Woodbine is not eligible for the installment method.  The component assets clearly not entitled to installment treatment are those classified in the American Cemetery Consultants' appraisal as grave spaces,

---

[20](...continued)
heirs-at-law or devisees of the deceased owner); Weiss v. Cedar Park Cemetery, 572 A.2d 662, 666-667 (N.J. Super. Ct. App. Div. 1990).  Therefore, the Woodbine burial rights appear to be more in the nature of real property than personalty.

mausoleum crypts, and cremation niches.

Respondent concedes that the Woodbine assets used in the trade or business not held for sale to customers in the ordinary course, such as the office building, the residence, the two service buildings, and the equipment, would qualify for installment treatment. We also include in the category of assets qualifying for installment treatment the roads, landscaping, lot markers, drainage, and fencing.

This leaves to be resolved the characterization of the Woodbine accounts receivable and undeveloped land.

The unrealized receivables of Woodbine arose from sales of inventory or property held primarily for sale to customers, consisting of mausoleum crypts. As such, they were ordinary income assets, deriving their character from the property that generated them, property that was held for sale to customers in the ordinary course of trade or business. See Coast Coil Co. v. Commissioner, 50 T.C. 528, 532-535 (1968), affd. per curiam 422 F.2d 402 (9th Cir. 1970); Family Record Plan, Inc. v. Commissioner, 36 T.C. 305, 308-313 (1961), affd. on other grounds 309 F.2d 208 (9th Cir. 1962); Liberty Natl. Bank & Trust v. Commissioner, T.C. Memo. 1979-74; cf. Fourth Natl. Bank v. United States, 36 AFTR 2d 75-5226, 75-2 USTC par. 9594 (N.D. Okla. 1975). It would be anomalous to allow the sale of the receivables to be entitled to installment treatment when the sales of the mausoleum crypts that generated them were not and would not have been entitled to installment treatment. Cf.

Liberty Natl. Bank & Trust Co. v. Commissioner, supra; Fourth
Natl. Bank v. United States, supra.

We now turn to whether the Woodbine undeveloped land was
entitled to installment treatment.  The record contains no
evidence whether the entire Woodbine tract was zoned exclusively
for cemetery purposes, or whether the undeveloped land was
already exclusively dedicated for cemetery development and sale
to customers in the form of grave plots, mausoleum crypts, or
cremation niches.  However, the American Cemetery Consultants
appraisal report reflects the assumption that the undeveloped
acreage would be so used, and the appraised value of the
undeveloped land was based on that assumption.

In the absence of any proof to the contrary by Alice Berger,
we conclude that the undeveloped land of Woodbine was most likely
held for later development into grave sites and similar property
and was therefore held for sale to customers, thereby requiring
it to be treated as dealer property.  Cf. Tollis v. Commissioner,
T.C. Memo. 1993-63.  In so doing, we reject Alice Berger's
argument that she was never in the cemetery business; we have
already held that she was.  We also reject any argument by her
that the events of 1989 were occasioned by her decision to retire
from the cemetery business, so as to change the character of the
Woodbine dealer assets to capital assets in her hands.  We
rejected a similar argument in Tollis v. Commissioner, supra, and
we do so here.  See Lawrie v. Commissioner, 36 T.C. 1117 (1961);
Estate of Ferber v. Commissioner, 22 T.C. 261 (1954); Grace

Bros., Inc. v. Commissioner, 10 T.C. 158 (1948), affd. 173 F.2d 170 (9th Cir. 1949); Martin v. United States, 330 F. Supp. 681 (M.D. Ga. 1971).

Respondent argues that the evidence in the record does not permit us to allocate the total Woodbine sale price of $680,000 among component assets qualifying and not qualifying for installment treatment. Cf. Monaghan v. Commissioner, 40 T.C. 680 (1963). Respondent therefore insists that Alice Berger has failed to carry her burden of showing that any of her gain qualifies for installment treatment and that therefore her entire gain on the sale to the Kunkowskis is taxable as ordinary income. We disagree.

The rule of Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), permits us to approximate the amounts of gain allocable to assets that qualify for the installment method. Cohan treatment has been given to allocations of accounting expenses between the capitalizable cost of selling a capital asset and the deductible expense of general auditing duties, Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1383 (11th Cir. 1982), affg. in part and remanding in part on this issue T.C. Memo. 1981-123, of an estate's partnership assets to land, a building, and personal property, McKelvey v. Commissioner, 246 F.2d 609, 613 (3d Cir. 1957), affg. T.C. Memo. 1956-70, and of the purchase price of a business among physical assets of the business, good will, and a covenant not to compete, Kreider v. Commissioner, 762 F.2d 580, 589 (7th Cir. 1985), affg. T.C. Memo. 1984-68; Levine v.

Commissioner, 324 F.2d 298, 302 (3d Cir. 1963), affg. T.C. Memo.
1962-68.

The American Cemetery Consultants appraisal identified the
gross value of the assets that we find to be qualified for
installment treatment as $381,200, out of a total gross asset
valuation of $842,768.[21]  We therefore find, using the Cohan
rule, that 45 percent of Alice Berger's gain from the sale
qualifies for installment treatment.[22]  We leave for the Rule 155
computation the determination of the ordinary gain currently
taxable to Alice Berger on the sale and the amounts and character
(as long-term or short-term) of the items of gain entitled to
installment treatment in her hands.

---

[21]Removing the $20,000 of cash from the equation leaves the
following allocation of capital gain (installment treatment) and
ordinary gain (dealer disposition) items:

| Assets qualifying for installment treatment | | Assets not qualifying for installment treatment | |
|---|---|---|---|
| Office building | $100,000 | Accounts receivable | $172,298 |
| Residence | 75,000 | Grave spaces | 12,518 |
| Service building | 80,000 | Mausoleum crypts | 42,992 |
| Storage building | 40,000 | Creamation niches | 14,205 |
| Equipment | 17,000 | Undeveloped land | 219,555 |
| Other equipment | 26,000 | | |
| Roads & landscaping | 43,200 | | |
| Total | 381,200 | | 461,568 |

[22]In so doing, we take account of the fact that the
appraisal company substantially discounted the value of the
Oct.1, 1988, receivables, amounting to $428,601--approximately
the same amount as the stipulated Nov. 17, 1989, face amount of
the receivables ($429,371)--to 41.6 percent of their face amount:
$172,298.

Issue 6.  Self-Employment Tax

Alice Berger asserts that she is not liable for any self-employment tax because she never owned or had a share in the ownership of the Woodbine business, as opposed to the land, and did not participate in the day-to-day operations or management of the business.  Howard Berger similarly argues that during 1988 and 1989 neither he nor Alice Berger participated in the operation of the cemetery business, so that no self-employment tax should be imposed on the Woodbine income of either of them.

Section 1401 imposes a tax on the "self-employment income" of every individual.  "Self-employment income" is defined generally in section 1402(b) as "the net earnings from self-employment derived by an individual * * * during any taxable year".  Section 1402(a) defines the term "net earnings from self-employment" as the "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  Section 1.1402(a)-2(b), Income Tax Regs., provides that "The trade or business must be carried on by the individual, either personally or through agents or employees."  These provisions are to be broadly construed to favor treatment of income as earnings from self-employment. Hornaday v. Commissioner, 81 T.C. 830, 834 (1983).

Petitioners do not deny that Woodbine was a trade or business under the principles laid down by Commissioner v. Groetzinger, 480 U.S. 23 (1987).  It doesn't matter whether Alice

and Howard Berger did or did not personally conduct the trade or business of Woodbine during the years in question. They carried on the business through Gregg Kunkowski, their agent or employee. Moorhead v. Commissioner, T.C. Memo. 1993-314; Price v. Commissioner, T.C. Memo. 1993-265.

During 1988 and until March 14, 1989, Howard and Alice Berger are each subject to self-employment tax on their respective shares of Woodbine's net earnings. During the period thereafter that Alice Berger alone owned the Woodbine business, she is subject to self-employment tax on her net earnings from the business, excluding any capital gain from her sale of the business. Sec. 1402(a)(3)(A).

Issue 7(a):  Late Filing Addition Under Section 6651(a)

If a taxpayer fails to file a return by the due date, including extensions of time for filing, and cannot show that the failure is due to reasonable cause and not willful neglect, section 6651(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax for each month, or fraction of a month, that the return is late, not to exceed 25 percent. Although Alice Berger filed her 1989 income tax return before the due date as extended, respondent determined that Alice Berger's requests for extensions of time to file were invalid and that she is therefore liable for an addition to tax under section 6651(a).[23]

---

[23]Respondent has conceded that Howard and Susan Berger are

(continued...)

If an extension of time to file is deemed invalid, it will not extend the due date of the return, and the taxpayer must show that the failure to file a return by the original due date was due to reasonable cause and not due to willful neglect. Crocker v. Commissioner, 92 T.C. 899, 912 (1989). An extension of time to file may be deemed invalid if the taxpayer did not make a bona fide and reasonable estimate of his tax liability using the information available at the time of the extension request. Id. at 908. Good faith reliance on the advice of a tax return preparer, who has been fully apprised of all relevant facts, may show that the taxpayer made a bona fide and reasonable estimate of tax liability. See O'Sullivan v. Commissioner, T.C. Memo. 1994-395. In addition, "The fact that we have come to a substantive conclusion about the * * * issue different from that of petitioners does not of itself indicate that petitioners filed their extension request with a lack of due care or reasonable cause". Id.

Alice Berger testified, and we believe, that she relied on her accountant to prepare her extensions and returns for 1989. She was receiving fairly sophisticated tax advice, even if it turned out, as we have seen, that the advice was wrong in various important respects. We would not expect a former housewife, inexperienced in business, financial, or tax matters, to prepare a rider to the 1988 joint return, citing legal

_____

[23](...continued)
not liable for this addition to tax.

authorities, as was done, to support her position that the return was invalid because she was signing under duress. At the times her accountant signed the requests to extend the times for filing her 1989 return, the 1988 return was under audit by the Internal Revenue Service. On September 13, 1990, the revenue agent issued a report taking the position that a substantial part of the Phase II deposits was taxable on the 1988 return. Her 1989 return, as filed on October 12, 1990, pursuant to the extensions, took the position, obviously with the return preparer's advice, that there was no tax due. This appears to have been due to the combination of three mistaken positions: First, that she had a net loss of $4,101 from Woodbine operations because the bulk of the gross income had been taxable in the prior year, in accordance with the revenue agent's recently issued report; second, the even more aggressive position she has been taking in this proceeding, that she was not taxable on any part of the 1989 Woodbine operating income because Howard Berger owned the Woodbine business in its entirety; and third, that she had no gain on the sale to the Kunkowskis because the attribution of the sale to Howard Berger under either or both of the "on behalf of" and step-transaction approaches under section 1041 gave her a basis in Woodbine equal to the amount realized of $680,000. Although we have concluded otherwise on the merits, we believe that there was a reasonable basis for Alice Berger's 1989 return positions, and for her failures to pay tax with her extension applications. We reject respondent's imposition of the section 6651(a) addition to tax.

Issue 7(b).  Accuracy-Related Penalty Under Section 6662

Respondent also determined that Alice Berger was liable for the accuracy-related penalty under section 6662 for 1989.  If any portion of an underpayment is attributable to negligence, disregard of rules or regulations, or substantial understatement of income tax, an amount equal to 20 percent of the portion of the underpayment attributable to such negligence, disregard, or understatement, is added to the tax.  Sec. 6662(a).  Petitioner Alice Berger bears the burden of proving that she is not liable for this penalty.  Rule 142(a).

Negligence is the failure to exercise due care or the failure to act as a reasonable and prudent person.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  The term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  We have found that Alice Berger acted as a reasonable and prudent person when reporting her 1989 income because she had a reasonable basis for estimating her 1989 tax liability as zero. By a parity of reasoning, we find that she did not carelessly, recklessly, or intentionally disregard rules and regulations in connection with the preparation and filing of her 1989 return. See Weis v. Commissioner, 94 T.C. 473, 487 (1990).

An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $5,000.  Sec. 6662(d)(1)(A).  An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, but the understatement will be reduced if

the taxpayer either had "substantial authority" for, or adequately disclosed, the tax treatment shown on the return. Sec. 6662(d)(2)(B).

Alice Berger provided enough information on her return for respondent to identify the potential controversy arising from the omission of $229,396--the amount the revenue agent's report had included on the 1988 joint return for the prior year--from her share of Woodbine's ordinary income for 1989. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987).

This leaves the question whether Alice Berger's 1989 return provided enough information for respondent to identify the potential controversy concerning her disposal of Woodbine. On that score, her 1989 return reported the sale proceeds of $680,000 and claimed a basis of $680,000, resulting in no reported gain. This disclosure was not sufficient to apprise respondent of the potential controversy.

We therefore address whether Alice Berger had substantial authority for her 1989 return positions. We decide whether a taxpayer had substantial authority by using the same analysis and the same precedents that we would use in deciding whether the taxpayer's treatment of the item was proper. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990). We consider the authorities at the time the return was filed, or at the end of the taxable year in question, even if those authorities are ultimately held inapplicable. Collins v. Commissioner, T.C. Memo. 1992-478, affd. 3 F.3d 625 (2d Cir.

1993); <u>Harston v. Commissioner</u>, T.C. Memo. 1990-538, affd. without published opinion 936 F.2d 570 (5th Cir. 1991). Substantial authority is an objective standard, less difficult to satisfy than "more likely than not", but more difficult to satisfy than "reasonable basis". <u>Antonides v. Commissioner</u>, <u>supra</u> at 702; secs. 1.6661-3(a)(2) and (b)(1), 1.6662-4(d)(2), Income Tax Regs. The weight of authorities supporting a taxpayer's treatment of an item must be substantial in relation to the weight of the authorities supporting contrary positions, and an authority is given little weight if it is materially distinguishable on its facts. Secs. 1.6661-3(b)(1), (3), 1.6662-4(d)(3)(ii), Income Tax Regs.

A taxpayer's position may be supported by authority even though there is no decided case or ruling supporting the position. "Thus, a taxpayer may have substantial authority for a position that is supported only by a well-reasoned construction of the applicable statutory provision." Secs. 1.6661-3(b)(3), 1.6662-4(d)(3)(ii), Income Tax Regs.

We believe that Alice Berger had well-reasoned positions that what we have held to be her share of the Woodbine income was not taxable to her under the assignment of income doctrine,[24] and

---

[24]When Alice Berger filed her 1989 return, in October 1990, the question whether the assignment of income doctrine or sec. 1041 would control the allocation of the income attributable to Howard Berger's interest in Woodbine had not been addressed in a published decision. However, the Internal Revenue Service had taken the position that the assignment of income doctrine could trump sec. 1041, and indeed apply to transfers of property with

(continued...)

because Howard Berger was the controlling owner of the Woodbine business so that he earned its entire income, which was paid to her as a property settlement.  We hold that Alice Berger had substantial authority for not reporting the ordinary income of Woodbine that she was led to believe by her advisers was properly taxable to Howard Berger.

We further believe that Alice Berger had substantial authority, also in the form of a well-reasoned position, that she had no taxable gain on the sale of Woodbine to the Kunkowskis. Her position was that section 1041 and the temporary regulations thereunder are susceptible to the interpretation and application that the transfer of the full interest in Woodbine to Alice Berger, followed by her previously agreed-upon court-ordered sale to the Kunkowskis, was "on behalf of" Howard Berger, or should be so regarded under step-transaction principles.  Cf. Arnes v. United States, 981 F.2d 456 (9th Cir. 1992).

Having concluded that Alice Berger had substantial authority for her 1989 return position that there was no tax due on her Woodbine transactions, we reject respondent's imposition of the section 6662 accuracy-related penalty.

To reflect the foregoing,

---

24(...continued)
inhering accrued income elements.  Compare Rev. Rul. 87-112, 1987-2 C.B. 207 with Asimow, "The Assault on Tax-Free Divorce: Carryover Basis and Assignment of Income", 44 Tax L. Rev. 65 (1988).  Our opinion in Balding v. Commissioner, 98 T.C. 368 (1992), a case of first impression holding that sec. 1041 trumps the assignment of income doctrine (see discussion supra pp. 54-55), was not published until March 1992.

Decisions will be entered

under Rule 155.